704 A.2d 104

D.J.L., PLAINTIFF, v. ARMOUR PHARMACEUTICAL
COMPANY, ET AL., DEFENDANTS.

Superior Court of New Jersey
Law Division
Middlesex County

Decided September 29, 1997.

---

*Robert F. Williams* and *George W. Conk* (*Tulipan & Conk*, attorneys) for plaintiff, D.J.L.; *Mr. Williams, Mr.Conk, Ronald B. Grayzel* (*Levinson, Axelrod, Wheaton, Grayzel, Caulfield, Marcolus & Dunn*, attorneys) and *Eric H. Weinberg*, on the brief.

*Michael R. Cole* (*Riker, Danzig, Scherer, Hyland & Perretti*) for defendant, Armour Pharmaceutical Company; *Mr. Cole, Susan M. Sharko* (*Shanley & Fisher*, attorneys) and *Sara J. Gourley* (*Sidley & Austin*, attorneys, admitted Pro Hac Vice) on the brief.

*John L. Thurman* (*Mason, Griffin & Pierson*, attorneys) argued the cause on behalf of the State of New Jersey; *Mr. Thurman* and *George W. Fisher* on the brief.

WOLFSON, J.S.C.

## I. INTRODUCTORY STATEMENT

This case involves plaintiff's claim that he contracted AIDS after taking anti-hemophiliac factor (AHF), a medicine prescribed for the treatment of hemophilia, and manufactured by the defendant, Armour Pharmaceutical Company (Armour). The question before the court is whether *N.J.S.A.* 2A:14–26.1 (the Act) which effectively extended the limitations period for certain civil suits against the proprietary plasma processors (the fractionators) is constitutional. By declaring July 13, 1995, to be the accrual date for all causes of action against the fractionators, the Act is alleged to destroy Armour's vested rights by breathing life into D.J.L.'s

complaint.[1] Plaintiff simultaneously moves to strike this affirma-
tive defense, urging that *N.J.S.A.* 2A:14–26.1 is constitutional.

Armour contends that the Act violates the Substantive Due
Process and Equal Protection clauses of the New Jersey Constitu-
tion and is contrary to the ban on special legislation.[2]

## II. FACTUAL BACKGROUND

### A. *Hemophilia and HIV*

Hemophilia is a genetic bleeding disorder characterized by a
deficiency of one or more of the proteins necessary for normal
human blood to clot. Approximately 85% of all hemophiliacs
suffer from a deficiency in the level of a Factor VIII protein,
known as hemophilia A. The remaining 15% suffer an absence of
Factor IX, known as hemophilia B.

The level of clotting factor present in the blood determines the
severity of the condition. Effective blood clotting requires a
factor concentration of at least 25%. Those with clotting factors
of more than 5% but less than 25% of the normal level are

---

[1] D.J.L. is one of 90 hemophiliacs or representatives of hemophiliacs who have
instituted actions in New Jersey against the blood plasma processors or fraction-
ators for transmitting the AIDS virus through their product, Factor VIII. By
order dated March 15, 1994, the New Jersey Supreme Court transferred all of
the pending cases throughout the State to Middlesex County, and assigned this
court to preside over their pre-trial management. D.J.L. is the first case to be
scheduled for trial.

[2] Following the enactment of *N.J.S.A.* 2A:14–26.1, four fractionators, including
this defendant, instituted a declaratory judgment action in the Chancery Divi-
sion, Mercer County, seeking to have that court declare the statute to be
unconstitutional. Judge Carchman, on his own motion, and pursuant to the
March 15, 1994 order of the Supreme Court, transferred the venue of that action
to this court. Given that the validity of the statute of limitations defense would
be resolved in one or more of the pending tort actions, the declaratory judgment
action has been held in abeyance. *See Hartmann v. Maplewood Sch. Transp. Co.*,
106 *N.J.Super.* 187, 195, 254 A.2d 547 (Law Div.1969), *aff'd*, 109 *N.J.Super.* 497,
263 A.2d 815 (App.Div.1970), *certif. denied*, 57 *N.J.* 124, 270 A.2d 27 (1970)
(declaratory judgment procedure unavailable to preempt or anticipate the deci-
sion of the court in another pending action).

considered "mild"; those with levels of 1% to 5% are considered "moderate"; and those with less than 1% of the normal clotting factor are classified as "severe."

The principal threat associated with hemophilia is the inability to heal from spontaneous internal bleeding into the joints, muscles, organs, brain, and body cavities, or from bleeding resulting from trauma, surgery or injuries to the vascular system. Often, such bleeding episodes, if not treated immediately, result in serious injury or death.

Although treatment for hemophilia has evolved over the years, all treatments depend, at least to some extent, on some method of infusion of normal clotting factor into the bloodstream. Historically, these methods have included infusing of whole blood, frozen plasma, or blood products containing the factor necessary for clotting to occur.[3]

The use of "factor concentrate" is the preferred method for treating hemophilia. The manufacture of this product requires concentrating the clotting proteins from large quantities of human plasma, which plasma is then pooled and subjected to a process of separation, fractionation, purification and freeze-drying.[4] The result is a highly concentrated dose of clotting factors, maintained in a powder form, which, when mixed with sterile water, is administered intravenously.[5]

Acquired Immunodeficiency Syndrome (AIDS) is caused by a retro virus called Human Immunodeficiency Virus (HIV) which

---

[3] By way of contrast, a "severe" hemophiliac may require numerous infusions per month, whereas a "mild" hemophiliac might require infusions only in an emergency situation, or prior to a medical or dental procedure.

[4] By pooling plasma from thousands of donors, the risk of transmitting blood-borne diseases is dramatically enhanced.

[5] Factor concentrate is regulated by the federal government under the Food, Drug and Cosmetics Act, 21 *U.S.C.A.* § 321(g)(1) (1972), and is subject to licensure regulation under Section 351 of the Public Health Service Act, 42 *U.S.C.A.* § 262 (1991).

invades and destroys the human immune system, rendering the immune system unable to protect the body from opportunistic infections. The disease is known to be fatal in 100% of the cases, has no known cure, and is spreading at a horrifying rate, having "increased more than 100 fold since [it] was discovered in 1981." Marsha F. Goldsmith, *"Critical Moment" at Hand in HIV/AIDS Pandemic*, New Global Strategy to arrest its Spread Proposed, 268 *JAMA* 445 (1992); *De Milio v. Schrager*, 285 *N.J.Super.* 183, 188–89, 666 *A.*2d 627 (Law Div.1995). HIV is not spread casually. Rather, it has specific and well-known modes of transmission through sexual contact, exposure to infected blood, or blood components, and perinatally from mother to infant. *De Milio, supra*, 285 *N.J.Super.* at 188–89, n. 2, 666 *A.*2d 627, and authorities cited therein. The development of clinical AIDS symptoms after the infection is typically lengthy and an HIV infected person may live for many years without knowing of the infection or exhibiting any symptoms of the disease.

In the early 1980's, during the onset of the AIDS epidemic, it was still not known what caused the disease, and testing for potentially HIV-infected-blood was not available. As a consequence, the use of contaminated blood or tainted blood products was high. Eventually a heat treatment was developed through which blood-borne diseases such as hepatitis and HIV would be inactivated. Ultimately every producer of factor concentrate developed a heat treatment process for its own product and, by 1985, had obtained the requisite licenses from the FDA to produce the heat-treated product.[6]

**B.** *The Legislative History*

 **1.** *Senate Bill No. 1476*

In 1994, the Hemophilia Association of New Jersey lobbied the New Jersey Legislature to eliminate all time barred defenses for

---

[6] At or about the same time, the FDA also approved a procedure known as the enzyme-linked immunosorbent assay test (ELISA), which enabled the testing of blood for the presence of HIV.

all claims brought by persons with hemophilia, their families, or their estates, for injuries or death resulting from the infusion of blood products that caused the transmission of AIDS. In response, on September 26, 1994, the New Jersey Senate introduced Senate Bill No. 1476 (S. 1476), which proposed to revive any such cause of action for a period of one year. In its original form, the Bill provided for a reopening of claims against any potential defendant, but was later amended to delete hospitals, doctors, blood banks, suppliers of whole blood, and non-profit factor concentrate processors from its reach, leaving only those claims against "proprietary manufacturers of blood products" to be reopened.

Although the Bill was passed 38–0 by the Senate and 73–1 in the Assembly on June 22, 1995, the bill was conditionally vetoed by the Governor on September 28, 1995, largely in response to the Attorney General's formal opinion that the legislation was "constitutionally deficient."

## 2. *Senate Bill No. 433*

Thereafter the New Jersey Senate introduced Senate Bill No. 433 (S. 433) an amended version of S. 1476, through which it sought to remedy the potential constitutional flaws of the prior bill, by setting a date certain for the accrual of the cause of action for those hemophiliacs infected with HIV. According to S. 433, the statute of limitations period would not be deemed to be triggered until July 13, 1995, the date upon which the Committee to Study HIV Transmission Through Blood and Blood Products of the Institute of Medicine (I.O.M.) released its findings that, "[i]n the Committee's judgment, heat treatment processes to prevent the transmission of hepatitis could have been developed before 1980, an advance that would have prevented many cases of AIDS in individuals with hemophilia." [7]

---

[7] I.O.M. Report at 95.

■ On February 7, 1996, a Senate substitute for S. 433 was introduced by Senators John Lynch and John Matheussen. Two weeks later the Assembly version was introduced. After being passed by the Senate 37–0 on March 21, 1996, S. 433 passed in the Assembly on May 6, 1996, by a vote of 76–1. On May 8, 1996, it was signed into law by the Governor and thereafter codified by *N.J.S.A.* 2A:14–26.1 as follows: [8]

1. a. The Legislature finds and declares:

(1) Over one-half of the people with hemophilia in this country were infected with the human immunodeficiency virus (HIV) in the early 1980's from contaminated blood products.

(2) AIDS, unlike any other disease, stigmatizes and isolates its victims. Victims, their families and survivors have been reluctant to step forward and seek compensation for their injuries through the legal system because of their legitimate fear of attendant publicity.

(3) Because of this fear, many did not seek timely redress. They also were unaware that blood product manufacturers may have had the technical capacity at the time to address the situation and may have been responsible for their injuries. It is only very recently that a government-sponsored report was issued indicating that the blood products could have been virally inactivated prior to the advent of the AIDS epidemic among blood product recipients.

(4) The scientific complexity of the issue, the compelling psychological and emotional trauma associated with the disease, the lack of publicly available information and the lack of definitive studies at the time combined to create a singular, unique circumstance which existing limitations principles are ill-suited to address.

(5) This act will provide a remedy for the bar which may be imposed by the statute of limitations in these cases by setting a date certain for the accrual of the cause of action.

(6) The Legislature expresses no opinion as to whether any blood product manufacturers may, or may not, have actually been at fault for the contracting of HIV and AIDS among blood product recipients. It is simply the intent of the Legislature to allow these particular victims "Their day in court" in light of the unique and extraordinary circumstances of their plight.

b. Notwithstanding the provisions of any other law to the contrary, no action for damages based upon personal injury, survivorship or wrongful death brought against a proprietary manufacturer of blood products based on infusion of a blood product resulting in contracting human immunodeficiency virus (HIV) or

---

[8] Legislative findings and policies are beyond judicial review. *Doe v. Poritz,* 142 *N.J.* 1, 15, 662 *A.*2d 367 (1995).

acquired immunodeficiency syndrome (AIDS) shall be deemed to accrue prior to July 13, 1995.

c. The provisions of this act shall apply to all pending claims, including any action which has been filed with a court but not yet dismissed or finally adjudicated.

2. The provisions of this act shall be inapplicable to any civil action governed by the statute of limitations of another jurisdiction.

3. This act shall take effect immediately.

[*N.J.S.A.* 2A:14-26.1.]

## III. LEGAL ANALYSIS

### A. *Judicial Review of Legislation*

The most awesome power inherent in an independent judiciary is, perhaps, its authority to declare a legislative act of a co-equal branch of government to be unconstitutional. Because of the extraordinary nature of such a decision, the courts, especially a trial level court, must be ever mindful of the strong presumption that a legislative enactment is valid, *Edgewater Inv. Assoc. v. Borough of Edgewater,* 103 *N.J.* 227, 510 *A.*2d 1178 (1986); *Newark Superior Officers Ass'n v. City of Newark,* 98 *N.J.* 212, 486 *A.*2d 305 (1985); *Hutton Park Gardens v. West Orange Town Council,* 68 *N.J.* 543, 350 *A.*2d 1 (1975), since it "represents the considered action of a body composed of popularly elected representatives." *N.J. Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 8, 292 *A.*2d 545 (1972) *app. dismissed,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972). Where reasonable minds might differ as to the constitutionality of the means devised by the lawmakers to serve a public purpose, the courts should respectfully defer. *Roe v. Kervick,* 42 *N.J.* 191, 229, 199 *A.*2d 834 (1964).

Only in circumstances where no conceivable basis can be offered to support the challenged law, *Mahwah Tp. v. Bergen County Bd. of Taxation,* 98 *N.J.* 268, 285–92, 486 *A.*2d 818 (1985) *cert. denied,* 471 *U.S.* 1136, 105 *S.Ct.* 2677, 86 *L.Ed.*2d 696 (1985); *Vornado, Inc. v. Hyland,* 77 *N.J.* 347, 356, 390 *A.*2d 606 (1978) *app. dismissed,* 439 *U.S.* 1123, 99 *S.Ct.* 1037, 59 *L.Ed.*2d 84 (1979), or where the action taken by the lawmakers has no substantial

relationship to a valid public interest under the police power, or is, "beyond all question, a palpable invasion of rights secured by the organic law," *Reingold v. Harper,* 6 *N.J.* 182, 194–195, 78 *A.*2d 54 (1951), should a state statute be invalidated.

One of the fundamental guidelines that aids courts in analyzing the constitutionality of a statute is "the presumption that the legislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner." *NYT Cable TV v. Homestead at Mansfield, Inc.,* 111 *N.J.* 21, 26, 543 *A.*2d 10 (1988); *see also Lomarch Corp. v. Mayor of Englewood,* 51 *N.J.* 108, 113, 237 *A.*2d 881 (1968). As noted in *Right to Choose v. Byrne,* 91 *N.J.* 287, 311, 450 *A.*2d 925 (1982), it is the court's duty "to save a statute if it is reasonably susceptible to a constitutional interpretation." Indeed, constitutional defects have even been judicially excised, and new meanings engrafted or implied by the courts, where it has been necessary to assure a statute's survival.[9]

### B. *The Scope of the Police Power*

In broad terms the Legislature may enact laws designed to promote the public health, safety or the general welfare of the population, within the exercise of its police power. This will inevitably include some instances where the police power is exercised to the detriment of some private property rights. Nonetheless such an enactment will survive constitutional attack so long as the police power objective, protection from some nuisance or other detriment, outweighs impairment of those property rights. *See Greenberg v. Kimmelman,* 99 *N.J.* 552, 494 *A.*2d 294 (1985); *Rothman v. Rothman,* 65 *N.J.* 219, 225, 320 *A.*2d 496 (1974); *see*

---

[9] Such "judicial surgery," is warranted only where it has first been judicially determined that the Legislature would have wanted the statute to survive as modified, rather than to succumb to constitutional infirmities. *NYT Cable, supra,* 111 *N.J.* at 28, 543 *A.*2d 10; *Right to Choose, supra,* 91 *N.J.* at 311, 450 *A.*2d 925; *compare, New Brunswick v. Old Bridge,* 270 *N.J.Super.* 122, 130, 636 *A.*2d 588 (Law Div.1993).

*also State, Dep't of Envtl. Protect. v. Ventron Corp.*, 94 *N.J.* 473, 499, 468 *A.*2d 150 (1983).

In *Ventron*, the Supreme Court addressed whether the breadth of the police power was sufficient to permit a retroactive application of the Spill Compensation and Control Act of 1977 ("Spill Act"), *N.J.S.A.* 58:10–23.11 to –23.11z. As enacted, the Spill Act proscribed the discharge of hazardous substances into New Jersey's waterways, and imposed strict liability upon anyone or any entity responsible for such discharge, jointly and severally, without regard to fault, for the entire cost of cleanup and removal. At issue there, was an amendment that imposed liability even for those discharges which occurred *prior* to the effective date of the act, "if such discharge poses a substantial risk of imminent damage to the public health or safety or imminent and severe damage to the environment." *N.J.S.A.* 58:10–23.11f(b)(2)(f), (b)(3).

The Court concluded that the Spill Act could be applied retroactively because, in its collective judgment, the public interest outweighed the impairment of private property rights. *Ventron, supra*, 94 *N.J.* at 499, 468 *A.*2d 150. Though the Court clearly acknowledged the significant financial detriment which could foreseeably befall private interests, it readily concluded that protecting the public interest would weigh heavily in the balance, rendering the statute constitutional. As explained by the Court: "[A] statute that gives retrospective effect to essentially remedial changes does not unconstitutionally interfere with vested rights." *Ventron, supra*, 94 *N.J.* at 499, 468 *A.*2d 150; *see also Pennsylvania Greyhound Lines, Inc. v. Rosenthal*, 14 *N.J.* 372, 381, 102 *A.*2d 587 (1954); *see also Rothman, supra*, 65 *N.J.* at 225, 320 *A.*2d 496, where the Court held:

A state may, in the exercise of police power, enact a statute to promote the public health, safety, morals or general welfare. Such a statute, because of retroactive application or otherwise, may diminish in value *or totally destroy* an individual's right, whether in property as such or arising out of contract, provided that the public interest to be promoted sufficiently outweighs in importance the private right which is impaired (emphasis supplied) (citations omitted).

[*Rothman v. Rothman* 65 *N.J.* 219, 225, 320 *A.*2d 496 (1974).]

 In enacting *N.J.S.A.* 2A:14–26.1, the Legislature and the Governor each carefully assessed the information compiled by a national commission and independently concluded that the damage that had been suffered by the hemophiliac community through its exposure to the AIDS virus was sufficiently strong to outweigh the detriment which would knowingly be visited upon the proprietary manufacturers in defending the merits of claims beyond the original limitation period.[10]

The Act simply preserves the right of those hemophiliacs with pending cases or with cases filed within the new statutory period, to be heard.

## C. *The Act's Accrual Date and Due Process*

 Armour argues that the Act, by reviving time-barred claims, violates the New Jersey Constitution [11] since it deprives

---

[10] *See N.J.S.A.* 2A:14–26.1, sec. 1(a)(1), (2) (Legislative finding that *more than half* of the people afflicted with hemophilia in the *Country* were infected with HIV in the early 1980's and were thereby stigmatized and isolated); *see also Williamson v. Waldman*, 150 *N.J.* 232, 244, 696 *A.2d* 14 (1997) (stigmatizing attitudes and erroneous beliefs about AIDS still prevalent); *accord De Milio v. Schrager*, 285 *N.J.Super.* 183, 189, 666 *A.2d* 627 (Law Div.1995) (individuals with AIDS often subjected to severe social stigma).

The public's interest in the enactment and effectiveness of *N.J.S.A.* 2A:14–26.1 are further implicated by the vast expenditures of public money which have been committed to the treatment of these people through the benefits of the Medicaid/Medicare system. Every citizen has an interest in seeing those public funds recovered if culpability is ultimately established for transmitting the HIV infection. *See N.J.S.A.* 30:4D–7.1 (State of New Jersey authorized to recover all benefits paid by it through Medicaid from the proceeds of a tort recovery); 42 *U.S.C.A.* § 1395y(b)(1) (all benefits paid are considered a federal lien in favor of the Medicare trust fund on any recovery from a tortfeasor).

[11] The New Jersey Constitution's guaranties of substantive due process and equal protection, though not expressed in those terms, have nevertheless been deemed inherent in Article 1, paragraph 1, which provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

Armour of an irrevocable right to rely on what it characterizes as a "fully-perfected" defense.[12] *See State v. Standard Oil Co.,* 5 *N.J.* 281, 74 *A.*2d 565 (1950), *aff'd sub. nom., Standard Oil Co. v. New Jersey,* 341 *U.S.* 428, 71 *S.Ct.* 822, 95 *L.Ed.* 1078 (1951).

In *Standard Oil, supra,* the New Jersey Supreme Court addressed whether the state's power to recoup unclaimed personal property through a newly-enacted escheat statute, could constitutionally extend to unpaid wages of former employees whose whereabouts were unknown. There the defendant argued that the newly-enacted statute violated its rights to due process since such persons had relinquished their rights to recover the personal property (by having failed to act within the required statute of limitations period) and that the State, standing in the shoes of those persons, could have no greater rights.

The State, relying on *Chase Securities Corp. v. Donaldson,* 325 *U.S.* 304, 314, 65 *S.Ct.* 1137, 1142, 89 *L.Ed.* 1628, *reh'g denied,* 325 *U.S.* 896, 65 *S.Ct.* 1561, 89 *L.Ed.* 2006 (1945), urged that there was no due process violation where the legislature enacted a statute to revive claims, since it affected only the remedy, and not the substantive right.[13] The Court rejected the more lenient federal

---

*See South. Burl. Cty. N.A.A.C.P. v. Township of Mount Laurel,* 67 *N.J.* 151, 174–75, 336 *A.*2d 713 (1975) *app. dismissed, cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975).

[12] As acknowledged at oral argument by both parties to the action *sub judice,* distilled to its most fundamental components, the issue simply is whether an unadjudicated "anticipation" or "hope" that a statute of limitations defense will prevail, is a vested property right, constitutionally protected against impairment by subsequent legislative enactments.

[13] In *Chase Securities Corp. v. Donaldson, supra,* the high Court had reasoned that statutes of limitations are representative of "a public policy about the privilege to litigate" and therefore the protection they afford litigants should not be considered a "fundamental right" but rather defenses which are given power only through the power of the legislature. As a result, they are subject to the relatively wide control of the legislative branch. *See also Campbell v. Holt,* 115 *U.S.* 620, 6 *S.Ct.* 209, 29 *L.Ed.* 483 (1885) (where the lapse of time has not invested a party with title to real or personal property, the Fourteenth Amend-

approach to due process, opting instead to afford greater protection under the State's Due Process Clause, and refused to differentiate "between a vested right of ownership to real and tangible personal property arising out of the statute of limitations and the operation of the statute as a defense to contracts." *Standard Oil, supra,* 5 *N.J.* at 293, 74 *A.*2d 565. Since the contractual claims of the creditors of the corporation were deemed time barred, the statutory defense was held to be a vested right, entitled to protection against legislative impairment.[14]

Additional support for Armour's position can be gleaned from the trial court's decision in *Holmes v. Russ,* 113 *N.J.Super.* 445, 274 *A.*2d 75 (Law Div.1971). There the court sought to apply the New Jersey Supreme Court's decision in *Immer v. Risko,* 56 *N.J.* 482, 267 *A.*2d 481 (1970) (abolishing interspousal immunity in a personal injury action) to the pending controversy. The trial judge held that the *Immer* decision would not operate to restart the statute of limitations period since such an interpretation would retroactively deny the defendant that statutory defense.[15]

In contrast to *Holmes,* (where the claim's accrual date was known) the stated purpose of the Act *sub judice* was, through legislative debate and deliberation, to determine what the appro-

---

ment permits a state legislature to repeal or extend a statute of limitations, even after the right of action may be barred thereby).

[14] *Ryder v. Wilson's Executors,* 41 *N.J.L.* 9 (1879), also relied upon by Armour, similarly involved contractual claims by creditors (when a right of action becomes barred by the existing statute of limitations, the right to rely upon the statutory defense is a vested right). *See also State v. Short,* 131 *N.J.* 47, 618 *A.*2d 316 (1993); *Moore v. State,* 43 *N.J.L.* 203 (1881) (vested rights of litigants cannot be deprived by subsequent legislation). Both of these cases, however, involved criminal complicity, implicating the individuals' liberty interests.

[15] In reaching his decision, Judge Heine noted that *Immer* neither addressed nor destroyed the statute of limitations defense, and did not revive any stale claims, but rather simply eliminated the availability of interspousal immunity as a defense. The cause of action, however, existed in the *Immer* case from the date of accrual—the date of the accident. *Holmes, supra,* 113 *N.J.Super.* at 448, 274 *A.*2d 75.

priate accrual date should be, beyond which the statute of limitation would not be tolled. In point of fact, the Legislature's selected method of addressing the procedural nightmares that inevitably would have vexed all parties in these cases, plainly advances legitimate governmental objectives. Because AIDS is such an insidious disease, often remaining undetected for extended periods of time, and because of the stigma associated with those infected, the courts' resources would have been severely compromised if it were compelled to adjudicate the multitude of plenary hearings otherwise required. Moreover, the potential for inconsistent or disparate results is also a legitimate legislative concern which, ironically, benefits not only infected hemophiliacs, but the fractionators as well.[16]

That the Act advances legitimate governmental objectives without impairing vested rights is supported by the Court's decision in *Panzino v. Continental Can Company*, 71 *N.J.* 298, 364 *A.*2d 1043 (1976). There plaintiff had suffered a 54% binaural hearing loss, apparently due to his long term exposure to loud noises at his place of work, but was unaware that the loss was work-related until six years after he retired. *Id.* at 300–01, 364 *A.*2d 1043.

When he filed his workers' compensation case, *N.J.S.A.* 34:15–34 provided that claims for compensable occupational disability were required to be filed within two years of the employee's last exposure during the course of employment, or within one year of discovery, whichever was longer, but that a claim would be *"forever barred"* unless presented within five years from the date of last exposure. *Panzino, supra,* 71 *N.J.* at 301, 364 *A.*2d 1043. Because the connection between his hearing loss and the conditions of his employment were not made within the "5 years or

---

[16] By setting the accrual date, *N.J.S.A.* 2A:14–26.1 has conceivably had the dual effect of extending the limitations period for those infected by tainted blood products, while at the same time, triggering the "discovery date" for future filings. Consequently, other than claims of minors, alleged incompetents, or wrongful death actions, further suits against the fractionators may have been precluded as of July 13, 1997.

forever barred" provision, the compensation case would indisputably have been time barred.

However, while Panzino's case was pending, the Legislature amended the Workers' Compensation Act, eliminated the "5 years or forever barred" provision, and substituted in its stead a requirement "that where a claimant knew the nature of the disability and its relation to the employment," the claim must be filed "within 2 years after the date on which the claimant first had such knowledge . . ." *Id.* at 301, 364 *A.*2d 1043. Since Panzino's claim had been filed within a month of learning that his hearing loss was work-related, the legislative initiative, if applicable, would have destroyed the company's expectation or "hope" that the claim would have been time barred.

In assessing whether the amendment could be applied to Panzino's case, the Supreme Court took note of the Sponsor's Statement, and divined a legislative intent that it be applied retroactively in order to eliminate time restrictions that it deemed to be "burdensome" and "arbitrary." [17] *Id.* at 301–02, 364 *A.*2d 1043. The defendant in *Panzino,* like Armour, argued that *Standard Oil* constitutionally precluded legislation which impaired a defendant's anticipation or "hope" that its statute of limitations defense would bar liability. *Id.* at 304–05, 364 *A.*2d 1043. In refusing "to accord this [contention] the comprehensive amplitude suggested by respondent," the Court determined that "it should be confined to the particular issue before the court in that case, i.e., the effect of

---

[17] The text of the Sponsor's Statement, eerily foreshadowed certain of the legislative findings and declarations accompanying the Act under review:

Occupational diseases are often of such an insidious nature that they do not become evident until years after exposure to the cause thereof. The bill memorializes this fact by abrogating the burdensome and arbitrary time restrictions presently in effect within which a claim for compensation must be filed, and which in fact may easily lapse before even the symptoms of disease are evident. As here prescribed, a claim would be permitted within 2 years after the claimant had actual knowledge of the nature of the disability and its relation to the employment.

lapse of time upon *a claim sounding in contract." Id.* at 305, 364 *A.*2d 1043 (emphasis added).

*Panzino, supra,* acknowledged a difference between rights obtained through statutory construction, versus those created by agreement through arms length negotiations. The very essence of tort law is to protect those to whom a duty of care is owed against injury. This is especially so where there exists a lack of knowledge or sophistication, or where the absence of equal bargaining position renders injured consumers or employees without any meaningful options or remedies. Certainly no one would seriously dispute so basic a principle that the State can, and should, enact appropriate measures to ensure the safety of the public by holding accountable those whose profit motives and conduct result in isolated or widespread injuries. That the means selected by the Legislature and the Governor in enacting the Act are rationally related to and further the purposes of the police power, is not debatable. Only if the benefits flowing from the Act are outweighed by the burdens imposed upon Armour, would this statute be deemed unconstitutional.[18] *See Ventron, supra,* 94 *N.J.* at 499, 468 *A.*2d 150. Given the Supreme Court's admonition in *Panzino, supra,* that *Standard Oil* be "confined" to claims "sounding in contract" *Panzino, supra,* 71 *N.J.* at 305, 364 *A.*2d 1043, Armour cannot tip the balance in its favor.

While the outer-most boundaries of the State's interest in protecting one group of citizens, as against the contrary interests of others have, perhaps, not yet been fully explored by our Supreme Court, some precedents exist which are instructive in analyzing whether Armour's "hope" or expectation of a statutory defense was sufficiently "vested" so as to be constitutionally protected against retroactive legislative interference.

---

[18] Here, aside from the obvious benefits afforded to the hemophiliac population, the Act also serves as a warning beacon and as a deterrent to those entities that would place dangerous pharmaceutical (or other) products into the stream of commerce, that they will be held to account for their actions and for the reasonableness of their testing protocols.

In *Phillips v. Curiale*, 128 *N.J.* 608, 617, 608 *A.*2d 895 (1992), for example, the Court analyzed whether the statute there in issue could constitutionally be applied retroactively. Where the Legislature intended a retroactive application,[19] an otherwise valid exercise of the police power will not be invalidated absent either a manifest injustice or an unconstitutional interference with vested rights. *Id.* at 617, 608 *A.*2d 895; *see also Ventron, supra,* 94 *N.J.* at 498, 468 *A.*2d 150; *Gibbons v. Gibbons,* 86 *N.J.* 515, 523, 432 *A.*2d 80 (1981).

In this case, the Act was expressly intended to have retroactive effect since it applied "to all pending claims, including any action which has been filed with a court but not yet dismissed or finally adjudicated," *N.J.S.A.* 2A:14–26.1. Consequently, I must determine whether the statute impairs or abrogates "vested rights," or otherwise results in a "manifest injustice."

A "vested right" has been defined as "a present fixed interest which ... should be protected against arbitrary state action." *Pennsylvania Greyhound Lines, supra,* 14 *N.J.* at 384, 102 *A.*2d 587. But there is no vested right in "the continued existence of a statute or rule of the common law which precludes its change or repeal." *Phillips, supra,* 128 *N.J.* at 620, 608 *A.*2d 895 (quoting *Savarese v. New Jersey Auto. Full Ins. Underwriting Ass'n,* 235 *N.J.Super.* 298, 309, 562 *A.*2d 239 (App.Div.1989)).

An "expectation," or a mere "hope", even when reasonably based upon present law, is not a vested right. Until there is a "final disposition of the litigation, ... new statutory provisions can constitutionally be applied ..." *Phillips, supra,* 128 *N.J.* at 623, 608 *A.*2d 895. A right cannot be regarded as vested unless it is something more than a "mere expectation ... based upon an

---

[19] Although the Court in *Phillips* did not find the Legislature to have intended retroactive application, it did conclude the enactment to be a valid exercise of the State's police power. Ultimately, the Court stayed the effective date of its decision, inviting the Legislature to declare its intent, thus allowing the plaintiff's case to proceed.

anticipated continuance of the present laws." *Id.* at 621, 608 *A*.2d 895. To be fully vested, there must be "a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or legal exemption from a demand made by another." *Id.* "Litigation expectations are never final." [20] *Id.* at 622, 608 *A*.2d 895.

Aside from constitutional concerns, equitable considerations will preclude retroactive application of a statute where a manifest injustice results. *Ventron, supra,* 94 *N.J.* at 498, 468 *A*.2d 150. Application of this standard involves a "weighing process" in which the extent to which the party challenging the statute detrimentally relied on existing law, must be measured against the salutary goals and objectives of the statute. *Phillips, supra,* 128 *N.J.* at 621, 608 *A*.2d 895.[21]

In this context, the existence of a "manifest injustice" depends upon "whether the affected party relied, to his or her prejudice, on the law that is now to be changed as a result of the retroactive application of the statute, and whether the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively." *Gibbons, supra,* 86 *N.J.* at 523–24, 432 *A*.2d 80; *see also Ventron, supra,* 94 *N.J.* at 498–99, 468 *A*.2d 150. In its motion, Armour asserts no

---

[20] Although Armour argues that the New Jersey Supreme Court "explicitly rejected" the more lenient due process analysis articulated by the U.S. Supreme Court in *Chase Sec. Corp., supra,* in 1951, *see Standard Oil, supra,* our Court did, in fact, embrace the underlying premise articulated in *Chase* that "statutory provisions can constitutionally be applied when there is no final disposition of the litigation." *Phillips, supra,* 128 *N.J.* at 623, 608 *A*.2d 895.

[21] Echoing the suggestions of a leading commentator, Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 *Harv. L.Rev.* 692, 696–97, the New Jersey Supreme Court in *Phillips, supra,* 128 *N.J.* at 621, 608 *A*.2d 895, acknowledged several factors to be weighed in a due process analysis: (1) the nature and strength of the public interest being served; (2) the extent to which the statute modifies or abrogates the asserted right; and (3) the nature of the right that the statute alters. *Accord Rothman v. Rothman,* 65 *N.J.* 219, 320 *A*.2d 496 (1974).

detrimental reliance, nor is any discernable in the extensive record of this case. No substantive defenses to the merits of the pending action have been altered or eliminated. Indeed, nothing "irrevocable" has occurred. Absent any demonstrable manifest injustice, the balance heavily favors the beneficent public purposes advanced by the Act.

Nor does the Due Process Clause of the Fourteenth Amendment prohibit retroactive application of state or federal legislation under the circumstances of this case. Where no final adjudication has been rendered, new statutory provisions can constitutionally be applied. *See Chase, supra,* 325 *U.S.* at 305, 65 *S.Ct.* at 1138; *International Union of Elec. Workers v. Robbins & Myers, Inc.,* 429 *U.S.* 229, 243–44, 97 *S.Ct.* 441, 450–51, 50 *L.Ed.*2d 427 (1976) (amendment of the Equal Employment Opportunity Act extending limitation period for charges to be filed which revived otherwise barred claims held constitutional); [22] *see also Usery v. Turner Elkhorn Mining Co.,* 428 *U.S.* 1, 18, 96 *S.Ct.* 2882, 2893–94, 49 *L.Ed.*2d 752 (1976) (the retroactive imposition of liability on coal mine operators for the effects of "black lung disease" on employees held constitutional "as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor . . .").

In the present case, New Jersey's Legislature and Governor can not be said to have acted irrationally or arbitrarily. Like the statutory scheme upheld in the *Usery* case, *N.J.S.A.* 2A:14–26.1 rationally advances the legitimate objective of spreading the costs associated with the treatment of the infected hemophiliac popula-

---

[22] As explained in *International Union, supra:*

> The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation. What it does forbid is taking life, liberty or property without due process of law . . . Assuming that statutes of limitation, like other types of legislation, could be so manipulated that their retroactive effects would offend the Constitution, certainly it cannot be said that lifting the bar of a statute of limitations so as to restore a remedy lost through mere lapse of time is per se an offense against the Fourteenth Amendment. 429 *U.S.* at 243–244, 97 *S.Ct.* at 450.

tion, if those who profited—the proprietary manufacturers of blood products—are liable.

### D. *The Act and Equal Protection*

 Armour alternately claims that the Act violates the Equal Protection Clauses of both the New Jersey and Federal Constitutions, contending that reviving stale claims as against such a narrow class of defendants, is without reasonable or rational basis.[23] Unquestionably, the Federal and New Jersey Constitutions require legislative distinctions to be both rational and advance legitimate governmental interests. *See Greenberg, supra,* 99 *N.J.* at 577, 494 *A.2d* 294; *Robinson v. Cahill,* 62 *N.J.* 473, 488, 303 *A.2d* 273, on reargument, 63 *N.J.* 196, 306 *A.2d* 65; *cert. denied sub nom., Dickey v. Robinson,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973); *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.,* 94 *N.J.* 400, 411, 466 *A.2d* 563 (1983). Within this framework, the judicial branch ought not substitute its judgment for that expressed by the legislative body, unless no rationale can be shown. *See Brown v. City of Newark,* 113 *N.J.* 565, 572, 552 *A.2d* 125 (1989); *see also Williamson v. Lee Optical of Okla.,* 348 *U.S.* 483, 487, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, *reh'g denied,* 349 *U.S.* 925, 75 *S.Ct.* 657, 99 *L.Ed.* 1256 (1955).

 While the protections guaranteed by the Fourteenth Amendment are identical to those available under the State Con-

---

[23] Pursuant to leave granted, the American Insurance Association (AIA) submitted an *Amicus* brief in the pending declaratory judgment action (*see* n. 2, *supra*), challenging the Act as violative of the Contract Clauses of both the State and Federal Constitutions (*N.J.* Const. Art. IV, sec. 7, par. 3; U.S. Const. Art. I, sec. 10) and the Commerce Clause, Art. 1, sec. 8, of the United States Constitution. Since the standards for analyzing a Contract Clause claim are admittedly similar to those applicable to an equal protection analysis, Brief of *Amicus Curiae* AIA, at p. 16, n. 10, the issue is not addressed beyond that which is discussed in section IIIB of this opinion. The commerce clause argument also requires little independent discussion. Assuming the Act disproportionately targets national markets to benefit local interests, it cannot be said that the concomitant burdens imposed upon out-of-state interests are without rational bases. *See* sections IIIC, D and E, and discussion therein.

stitution, the reach of Article I, paragraph 1,[24] is not dependent upon the "multi-tiered" analysis applicable to the Federal Constitution, but rather, upon a balancing test. *See Brown, supra,* 113 *N.J.* at 573, 552 *A.*2d 125, *Barone v. Department of Human Servs.,* 107 *N.J.* 355, 368, 526 *A.*2d 1055 (1987); *Greenberg, supra,* 99 *N.J.* at 567, 494 *A.*2d 294; *Right to Choose v. Byrne, supra,* 91 *N.J.* at 308–09, 450 *A.*2d 925.

█ As construed by our Supreme Court, the right to equal protection does not deny the legislature the right to use classifications; it does however, require that they not be arbitrary. *Doe v. Poritz,* 142 *N.J.* 1, 91–92, 662 *A.*2d 367 (1995) quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 *U.S.* 432, 441–42, 105 *S.Ct.* 3249, 3255, 87 *L.Ed.*2d 313 (1985):

> Where individuals in the group affected by a law have distinguishing characteristics relevant to the interests the state has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choice as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.

█ The State has enunciated several reasonable bases for justifying the classifications contained in the Act. For instance, the stigma associated with HIV and AIDS prevented many suffering from the illness from coming forward. The State's legitimate interest in ensuring that those who were injured through no fault of their own, have the opportunity to have their claims heard in a court of law is of paramount importance. This goal is especially important given the State's findings that material information regarding the nature of the disease, the means of its transmission, as well as other information which might otherwise have put those injured on notice of their possible claims, was not previously made available.

---

[24] While the New Jersey Constitution does not expressly use the phrases "due process" or "equal protection," like the Fourteenth Amendment, it seeks to protect life, liberty and the pursuit of happiness and protect individuals from unequal protection under the laws. *See* n. 11, *supra.*

While the Act singles out the proprietary blood product manufacturers as the only class of defendants to be affected, this classification, too, is rationally related to furthering legitimate governmental objectives. Only fractionators (blood product manufacturers) were responsible for producing the product while profiting from its distribution. Holding this group accountable is consistent with one of the overriding purposes of product liability law—to spread the burden of damages which flow from such injuries onto those responsible for the products' design and manufacture.[25]

Nor can the Legislature's determination to exclude non-profit companies, such as the Red Cross, hospitals and others, be deemed unreasonable since they too, are separately protected under existing law. *See N.J.S.A.* 2A:53A–7, 8. Since the public policy of New Jersey favors allocating the costs of injuries caused by products to those responsible for the products' design, the balancing analysis compels the conclusion that the State's classifications were reasonable and, therefore, constitutional.

### E. *The Act and the Prohibition against Special Legislation*

The test for determining whether a statute constitutes invalid special legislation under Article IV, section vii, par. 7 of the New Jersey Constitution,[26] "is essentially the same as that which

---

[25] While those in the wholesale and retail chain of distribution may potentially be liable for the foreseeable injuries proximately caused by defective products intended for ultimate sale to the public, they may be relieved from liability where they comply with the exculpatory provisions of the Products Liability Act, *N.J.S.A.* 2A:58C–9, which provide in relevant part:

> a. In any product liability action against a product seller, the product seller may file an affidavit certifying the correct identity of the manufacturer of the product which allegedly caused the injury, death or damage.

> b. Upon filing the affidavit pursuant to subsection a. of this section, the product seller shall be relieved of all strict liability claims, subject to the provisions set forth in subsection d. of this section. Due diligence shall be exercised in providing the plaintiff with the correct identity of the manufacturer or manufacturers. *N.J.S.A.* 2A:58C–9.

[26] Article IV, section vii, paragraph 7 provides: "No general law shall embrace any provision of a private, special or local character."

determines whether it affords equal protection of the laws."
*Phillips, supra,* 128 *N.J.* at 627, 608 *A.*2d 895. (quoting *Mahwah, supra,* 98 *N.J.* at 285, 486 *A.*2d 818).

New Jersey courts have set forth three considerations in determining whether a statute violates the constitutional prohibition against special legislation. *See Newark Superior Officers Ass'n v. The City of Newark,* 98 *N.J.* 212, 222–23, 486 *A.*2d 305 (1985). First, a statute is presumed to be constitutional and may not be declared void unless it is clearly repugnant to the constitution. *See Paul Kimball Hosp. v. Brick Township,* 86 *N.J.* 429, 446–47, 432 *A.*2d 36 (1981). Second, the burden is on the party challenging the statute to show that the law is clearly violative of the constitution. *See Piscataway Township Bd. of Educ. v. Caffiero,* 86 *N.J.* 308, 318, 431 *A.*2d 799 *app. dismissed,* 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.*2d 470 (1981). Lastly, the focus is not on who is *included* but, rather, upon who is *excluded* by the legislation. *See Budd v. Hancock,* 66 *N.J.L.* 133, 48 *A.* 1023 (1901). Only where the law creates unreasonable distinctions that exclude those who would naturally be related to those included, will the law be declared invalid. *See Secaucus v. Hudson County Bd. Of Taxation,* 133 *N.J.* 482, 494, 628 *A.*2d 288 (1993), *cert. denied sub nom., City of Bayonne v. Town of Seacaucus,* 510 *U.S.* 1110, 114 *S.Ct.* 1050, 127 *L.Ed.*2d 372 (1994).

In considering whether legislation is general or special, the court must address: (1) the purpose and subject matter of the statute; (2) whether any persons are excluded who should be included; and (3) whether the classification is reasonable, given the purpose of the statute. *Jordan v. Horsemen's Benevolent and Protective Ass'n,* 90 *N.J.* 422, 432–33, 448 *A.*2d 462 (1982); *Vreeland v. Byrne,* 72 *N.J.* 292, 298–99, 370 *A.*2d 825 (1977).

Turning to the present case, it is clear that the purpose of the Act is to provide relief for a class of persons who legitimately feared coming forward to seek redress due to the nature of the disease and the public ridicule that was, and often, still is, associat-

ed with it. It further corrected a perceived anomaly created by a rigid statute of limitations ill-suited to address the class of persons affected, and provides an opportunity to shift the cost of the injuries from the public to the fractionators (if proven responsible).

The classifications made by the Act are inextricably intertwined with the purposes of the legislation. Those benefitted by the Act are all persons injured by the infusion of HIV-infected blood products. This class of persons does not exclude any similarly situated persons, but rather, includes those most acutely affected by the lack of knowledge, the stigma of the disease, and the widespread injury. As articulated by the Supreme Court:

> The classification is not defective because the legislative objective might have been more fully achieved by a more expansive classification; the Legislature may recognize degrees of harm and in devising a remedy it may proceed cautiously step by step.
>
> [*Robson v. Rodriquez*, 26 *N.J.* 517, 526, 141 *A.2d* 1 (1958) (citing *N.J. Restaurant Ass'n v. Holderman*, 24 *N.J.* 295, 300, 131 *A.2d* 773 (1957)).]

Accordingly, Armour's contention that the Act fails as "special legislation" is rejected.

## IV. CONCLUSION

In *N.J. Ass'n for Retarded Citizens v. Human Services*, 89 *N.J.* 234, 252, 445 *A.2d* 704 (1982), Justice Pashman confirmed the fundamental tenet by which we, in New Jersey, choose to live: "[i]n this State, we do not set people adrift because they are victims of misfortune. We take care of each other." Because of the unique obstacles and circumstances confronting the hemophiliac community, the Legislature has declared it the public policy of this State to allow blood product recipients infected with HIV an opportunity to establish culpability for their misfortune. This public policy "affirms our common humanity." *Id.* Based upon these policy considerations and recognizing the high degree of deference that is owed both to the State Legislature and to the Governor, I conclude that *N.J.S.A.* 2A:14–26.1 does not violate any provisions of the Constitutions of New Jersey or the United

States. Accordingly, Armour's application is denied, and D.J.L.'s cross motion to dismiss Armour's affirmative defense, asserting the statute of limitations, is granted. Plaintiff shall submit an appropriate form of order under the five-day rule, incorporating this opinion by reference. The order should include a provision requiring that it be served upon liaison counsel for the defendants in all cases subject to the March 15, 1994 case management order of the Supreme Court.