**C. DOE, Plaintiff,**

v.

**CUTTER BIOLOGICAL, Defendant.**

**No. 90–687–CIV–ORL–22.**

United States District Court, M.D. Florida, Orlando Division.

Feb. 19, 1993.

Judith S. Kavanaugh, Peeples, Earl & Blank, Sarasota, FL, Robert Edwin Turffs, Kanetsky, Moore & Deboer, P.A., Venice, FL, Thomas L. Colaluca, Cleveland, OH, for plaintiff.

Duncan Barr, JoAnn Arkfeld, O'Connor, Cohn, Dillon & Barr, San Francisco, CA, Patricia E. Lowry, Steel, Hector & Davis, West Palm Beach, FL, Charles P. Goodell, Jr., Goodell, Devries, Leech & Gray, Baltimore, MD, for defendant.

## ORDER

CONWAY, District Judge.

This cause comes before the Court for consideration of Defendant Cutter's Second Motion for Summary Judgment on the Basis that Plaintiff's Amended Complaint is Time–Barred (Dkt. 154), filed September 11, 1992. The Court has reviewed the Plaintiff's response and the materials submitted by both parties in support of their memoranda of law. Because this action is time-barred under applicable Florida law, the Defendant's motion for summary judgment is granted.

Summary judgment is appropriate only when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), F.R.Civ.P. In making this determination, the Court must view all of the evidence in a light most favorable to the non-moving party. *Samples on Behalf of Samples v. Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). The moving party has the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Next, the "non-moving party ... bears the burden of coming forward with sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). To that end, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file', designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The issue here is whether there exists a genuine issue of material fact that Plaintiff's cause of action accrued more than four years prior to the filing of this action. Defendant has the final burden of showing the absence of any material fact in order to prevail on its motion.

## I. FACTS

Plaintiff, an adult male, suffers from hemophilia, a hereditary disease characterized by abnormally low levels in the blood of a protein called "Factor VIII." Factor VIII is a clotting protein. Hemophiliacs lack this clotting protein and are therefore subject to spontaneous hemorrhage into soft tissues, bones, joints, muscles and the brain. These bleeding episodes can be fatal. Bleeding into joints can cause severe arthritis and crippling. Severe hemophiliacs like Plaintiff must use blood products on a regular basis to prevent or treat bleeding episodes.

One such blood product is concentrated Factor VIII. Developed in the late 1960's, Factor VIII concentrates offer advantages over other therapies such as transfusions

of whole human blood, plasma, and cryo-precipitate (a derivative of plasma taken from a single donor or small groups of donors). For example, transfusions of whole blood involve a large volume of fluid, creating a significant risk of vascular overload and congestive heart failure. In contrast, with factor concentrates the level of clotting factor sufficient to stop bleeding can be achieved without the risk of vascular overload. Additionally, factor concentrates can be stored easily; a hemophiliac can carry a supply with him to school or to work. These unique characteristics of concentrates allow prompt treatment of trauma or a spontaneous bleeding episode. This, in turn, improves treatment and also allows hemophiliacs greater freedom of movement. Indeed, Factor VIII concentrates allowed Plaintiff to maintain a more normal lifestyle than otherwise would have been possible.

Plaintiff began using Factor VIII concentrates in the late 1960's or early 1970's. During the time relevant to this action, Cutter processed and distributed Factor VIII concentrates under the name Koate. Koate is a prescription biological product, available only through a licensed physician.

Plaintiff has stated that in November 1983, he received a memorandum from the Central Florida Blood Bank that enclosed a letter from Cutter dated October 31, 1983. The Cutter notice listed lot numbers that were being voluntarily withdrawn by Cutter, and also states:

> The purpose of this letter is to make you aware that the above lots contain plasma donated from an individual who subsequently was diagnosed as having Acquired Immune Deficiency Syndrome (A.I.D.S.).

According to Plaintiff, the memorandum and letter prompted Plaintiff to return to the blood bank about six vials of one of the affected lots. These events provided Plaintiff with the first notice he can recall of the possibility that Acquired Immune Deficiency Syndrome (AIDS) could be transmitted through blood or blood products.

In April 1984, medical researchers identified the virus HTLV–III (now known as the human immunodeficiency virus or "HIV") as the cause of AIDS. After that discovery, a test was developed to detect antibodies to HIV. Licensed by the FDA in March 1985, the ELISA (enzyme linked immunosorbent assay) test has proven almost 99% effective in detecting exposure to the AIDS virus. The ELISA test, however, detects only the presence of antibodies to HIV. There is still no screening test for the presence of the virus itself.

In September 1985, on the recommendation of his physician, Dr. Clarence H. Brown, III, Plaintiff was given an ELISA test. The result was positive, indicating that Plaintiff had been exposed to HIV. Before the end of October 1985, Dr. Brown informed Plaintiff that he had tested positive for HIV. Plaintiff now alleges that he became infected in 1983 with HIV, the virus that causes AIDS, as a result of being treated with HIV-contaminated Koate.

Dr. Brown provided Plaintiff with the following explanation of the meaning of a positive test result:

> What I provided to him and to all of the other patients who were positive at that time, was a package of information that had been provided to me by the Hemophilia Association of Central Florida and the National Hemophilia Foundation which was a published description of the impact of being positive for HTLV–III, how one was to use the information that one was positive for the virus, in terms of how it was contracted, how it was transmitted, what one should do in practicing safe sex, if you will, for the reduction of the transmission of the virus to sexual contacts, how to handle this information with health care providers dealing with the individuals, such as dentists, surgeons, other physicians. All of that was a package that was produced by the National Hemophilia Foundation and transferred to our patients who were part of the Hemophilia Association of Central Florida of which I was at that time a medical director. So I was serving not only as the information liaison as medical

director but also as a private or personal physician of a number of these hemophiliacs.

. . . .

In terms of my specific conversation with [Plaintiff], I don't recall [telling Plaintiff what his medical course likely would be]. But, all of the patients who tested positive were informed of what we all now know about HIV being a life long infection, that there would be life long ramifications of that in terms of the potential for serious illness, certainly as we all know early death from those serious illnesses, and that he would need to inform his spouse of the positive results. In fact, she was tested at the same time he was tested and she tested negative.

Dr. Brown Deposition dated August 8, 1991, at 8–10.

In his deposition, Plaintiff made the following statements regarding the conversation with Dr. Brown:

Q. But you were told in the fall of 1985 that you had tested positive for HIV antibody?

A. Yes.

Q. What did Dr. Brown tell you about it at that time?

A. That I had a 50/50 chance to live.

Doe Deposition dated July 30, 1991, at 71. During this meeting, Dr. Brown also stated that the HIV infection "probably occurred" from the factor concentrates. Doe Deposition dated August 8, 1991, at 55–56.

In addition to discussing the HIV positive test results with Dr. Brown,[1] Plaintiff discussed his situation with other individuals and sought out whatever information was available from the medical community. Of particular interest to the Court is the information that was available to Plaintiff regarding the effects of the HIV virus itself and the connection between the virus and AIDS.

For example, an "AIDS UPDATE," dated March 1985 from the Hemophilia Information Exchange of The National Hemophilia Foundation contained the following information:

. . . .

3. What are the causes of AIDS?
The cause of AIDS is a virus of unusual type, and most experts now believe this virus to be the human T lymphotropic virus III (HTLV–III), as described in later sections of this document.

. . . .

4. How does one get AIDS?
The great majority of people who are exposed to the AIDS agent appear not to be susceptible to AIDS, or to develop such mild symptoms that no disease is detectable after exposure to the virus.

. . . .

11. Does the finding of antibodies to HTLV–III indicate a person has AIDS?
No. Many persons with hemophilia have been exposed to this virus without developing any evidence of AIDS.... Having antibodies simply indicates that one has been exposed to the virus and had an immune response to it.

. . . .

14. What do early tests of HTLV–III in hemophilia show?
The majority of persons with hemophilia have developed an antibody against HTLV–III, indicating they have been exposed to the agent and have developed an immune response to it. This

---

1. In describing his discussions with Plaintiff, Dr. Brown has noted:
   With [Plaintiff] it has always been a very open, intellectual dialogue. He's a very intelligent man who has a full understanding of what this means and it's been very comfortable in discussing all of these things with [him]. He's been a leader in the hemophilia association at a local and state level, so it's never been a difficult problem with him. In fact, he's been one of those who has been helpful in providing information to others. Dr. Brown Deposition dated August 8, 1991, at 10.

indicates that HTLV–III generally produces no clinical symptoms or very mild symptoms, and only rarely cause [sic] AIDS to occur. This is similar to the situation with hepatitis virus: most persons with hemophilia have hepatitis B antibody, but rarely does severe liver disease (e.g., cirrhosis) develop.

. . . .

An "AIDS UPDATE," dated July 25, 1985, from the same organization provides the following information:

. . . .

5. If I am the sexual partner of a person with hemophilia who has a positive HTLV–III antibody test, what should I do?

Until more information is available, NHF is recommending the use of condoms. Many persons with hemophilia have been exposed to this virus without developing any evidence of AIDS. Having antibodies simply indicates the individual has had an immune response. Recent research, however, has shown that in some instances the virus has been transmitted to sexual partners of otherwise healthy persons with hemophilia, and only in extremely rare instances, has the disease been transmitted. But it is important to remember that preventive measures can be taken (see section B, below).

. . . .

11. How am I and my partner to cope with the AIDS risk?

AIDS is not an invariable consequence of multiple transfusions. Even though a person is exposed to the virus the chances of him or her developing AIDS are low. Some people exposed to the virus: will develop AIDS (less than 1%); some may develop symptoms of mild immune deficiency which does not progress to AIDS; others may carry the virus without any symptoms of illness; some may develop antibodies to the virus; the rest will not carry the virus. It is the uncertainty of outcome that creates emotional discomfort.

. . . .

Whatever may have been the information available in 1985, at some point the information available to the medical community progressed until it became fairly widely accepted that a person who tested positive for HIV would be likely to develop AIDS. Dr. Brown, in his deposition, made the following statements regarding this growing awareness:

Q. Did there come a time, Dr. Brown, between, say, the middle of '85 and the time that you stopped being the medical director when the information available on AIDS and hemophiliacs suggested that the large majority of hemophiliacs who had—who were testing positive for HIV would at some point in time develop AIDS?

A. Yes.

Q. Do you recall during what time frame that became apparent to you?

. . . .

THE WITNESS: I would say within one to two years after testing became available in March of 1985, those of us taking care of hemophiliacs and the hemophiliac population appreciated that fact.

Q. All right. Is it your belief, then, based on what you said, that sometime between May of 1986 and May of 1987 the Plaintiff in this case appreciated the fact that because he had tested positive for HIV that he would at some point in time develop AIDS?

A. I would say that would be at the latest when he would have some understanding of that, since we knew in 1985 he was HIV positive, and information by, I would say, 1987 was available that once HIV positive the risk of developing AIDS was virtually 100 percent.

Dr. Brown Deposition dated September 3, 1992, at 180–81.

In addition to discussing with others the information that was available regarding the HIV virus and AIDS, Plaintiff dis-

cussed the relative merits of bringing a lawsuit. Plaintiff solicited various opinions, including those of his parents, his wife, his brother and of a Dr. Craig Kitchens, M.D. Plaintiff initially stated in a deposition that he recalls the conversation with Dr. Kitchens taking place in 1986 or 1987. Doe Deposition dated September 3, 1992, at 32–34. Plaintiff has subsequently asserted that the conversation took place in 1988.

Plaintiff provides the following account of his conversation with Dr. Kitchens:

Q. What do you recall discussing with Dr. Kitchens in '86 or '87?

A. I asked him his opinion of hemophiliacs suing providers or pharmaceutical companies.

Q. And what did he tell you?

A. He told me it was asinine. I remember his turning up his face and stomping his foot down and told me, he said, Doe, I think it is asinine. He always called me by my last name. And he said, I think it is asinine. He said, it is stupid. He said, they're going to go out of business and hemophiliacs won't be able to get their factor.

Q. How do you recall that as being in '86 or '87?

A. Because of—it was around the time that there was major litigation coming out. Some hemophiliacs were getting sick and there was some major litigation in the news.

. . . .

Q. Did anyone suggest to you that you go to Dr. Kitchens and seek his opinion about bringing a lawsuit?

A. About bringing a lawsuit?

Q. Yes.

A. No one suggested that I go to him.

. . . .

Q. Has anyone at Cutter ever suggested to you directly that you speak to Dr. Kitchens about your lawsuit?

A. Would you rephrase that, please?

Q. Has anyone from Cutter ever, through correspondence or verbally, advised you personally to speak to Dr. Kitchens?

A. No—about my lawsuit, you're saying?

Q. Or about anything, for that matter?

A. I don't remember that anyone ever did.

Q. Did you ever approach Dr. Kitchens specifically for advice about whether you personally should bring a lawsuit?

A. Just—I think our discussion was asking him the opinion of hemophiliacs in general bringing lawsuits, and I think a few of them—well, we did discuss some names of some lawsuits when we were discussing that happening.

Q. But, you never specifically went to him and said, "Should I file a lawsuit?"

A. I don't remember doing that.

. . . .

*Id.* at 33–34 and 43–44.

In an affidavit provided in response to Defendant's motion for summary judgment, Plaintiff now makes the following statement regarding his conversation with Dr. Kitchens.

In 1988, after the Ray family filed suit against Cutter Laboratories and another pharmaceutical company for negligence, arising out of the infection of the three Ray boys with the AIDS virus through the use of factor concentrates, I discussed with Dr. Craig Kitchens whether I or other hemophiliacs should consider such a lawsuit in the event it turned out I had been infected and developed AIDS. I had great respect for Dr. Kitchens' opinion, as I had known him for years during his tenure with the Florida Hemophilia Association. Dr. Kitchens told me that the Rays were wrong to file suit and that Cutter Laboratories had done everything possible to make the factor concentrates safe and were not at fault in any way. He stated that if hemophiliacs

filed law suits [sic] against Cutter and the other companies it would make Cutter stop manufacturing factor concentrates and the hemophiliacs would have to use other treatments. Based on his advice, I did not seek legal advice at that time.

It is now clear that counsel for Defendant contacted Dr. Kitchens in January 1988 about the possibility of acting as a consultant on behalf of Defendant. Dr. Kitchens was not retained as an expert witness on behalf of Defendant during 1988 nor was he paid any money by or on behalf of Defendant during 1988. In February 1989, counsel for Defendant contacted Dr. Kitchens regarding a case pending against Defendant in Florida. In April 1989, Dr. Kitchens received compensation for his services as an expert witness on behalf of Defendant.[2]

Assuming that Plaintiff's conversation with Dr. Kitchens did occur in 1988, rather than 1986 or 1987, it is clear that Plaintiff did not know at the time of the conversation that Dr. Kitchens had been contacted by counsel for Defendant. In 1990, Plaintiff began to show symptoms of AIDS.

## II. LEGAL ANALYSIS

The parties appear to agree that Plaintiff's claims are subject to a four-year statute of limitations pursuant to Section 95.11 of the Florida Statutes. The four year time period begins running "from the time the facts giving rise to the cause of action

**2.** Plaintiff also refers to a letter sent in 1990 by Defendant to the mother of hemophiliac sons in Orlando. The letter refers the mother to Dr. Kitchens, among others, for additional information regarding AIDS.

It appears that Plaintiff never saw the 1990 letter. In any case, there is no argument that he in any way relied on such a letter. The letter appears to relate to other claims made by Plaintiff. Its only relevance to the issues the Court must consider at this juncture is that it tends to establish a relationship between Dr. Kitchens and Defendant in 1990.

**3.** Plaintiff has asserted that "fraud and products liability claims accrue when both of two events have occurred: 1) the plaintiff discovers he was injured, *and* 2) that it arises out of Defendant's negligent act." Memorandum (Dkt. 177) at 6.

were discovered or should have been discovered with the exercise of due diligence...." Fla.Stat. § 95.031(2) (1991).

Defendant has referred the Court to *University of Miami v. Bogorff*, 583 So.2d 1000 (Fla.1991) for interpretation of the statute of limitations in a products liability case. In *Bogorff*, the Florida Supreme Court states that "[p]laintiffs need only have notice, through the exercise of reasonable diligence, of the possible invasion of their legal rights." 583 So.2d at 1004. The plaintiffs in *Bogorff* had such notice when they became aware of a dramatic change in their son's physical condition and also became aware of the *possible* involvement of defendant's product. The *Bogorff* holding has been explained more fully as follows:

We interpret the test which the supreme court has fashioned here as having two essential ingredients: an injury distinct in some way from conditions naturally to be expected from the plaintiff's condition, *and* (as opposed to *or* in the medical malpractice context) exposure to the product in question. Use of the conjunction 'and' in this equation necessarily implies that the connection must be to some extent causal. There could be no 'invasion of their legal rights' unless this were so.

*Babush v. American Home Products Corp.*, 589 So.2d 1379 (Fla. 4th DCA1991) (emphasis in the original).[3]

The court in *Babush* did not require an awareness of a negligent act by a plaintiff before the statute of limitations was triggered in a product liability case. The plaintiff need only be aware of exposure to the product so as to suggest causation.

In this case, Plaintiff was aware of exposure to the factor concentrate that allegedly caused his HIV virus in 1983 and was informed by his doctor in 1985 that he probably acquired the HIV virus from factor concentrate. Therefore, one prong of the *Babush* test was satisfied at least by 1985. It was not necessary for Plaintiff to realize that Defendant's acts were allegedly negligent before the statute of limitations was triggered. Therefore, Plaintiff's arguments related to when Plaintiff first learned of alleged negligence in connection with the filing of other lawsuits is not relevant.

Defendant argues that Plaintiff was on notice that he was injured when Defendant recalled some of its factor concentrate in 1983.[4] This position is supported by the analysis in *Doe v. American National Red Cross*, 796 F.Supp. 395 (W.D.Wisc.1992). Alternately, Defendant argues that at the very latest, Plaintiff was on notice that he was injured when he tested positive for the HIV virus in the fall of 1985. Defendant's argument assumes that the injury to Plaintiff is the HIV virus itself. By contrast, Plaintiff argues that it is the onset of AIDS, not the HIV virus, that is Plaintiff's injury. Plaintiff first experienced pre-AIDS symptoms in 1990 and then filed this suit on September 12, 1990. Under Defendant's analysis, Plaintiff's claims are time-barred for failure to file suit by the fall of 1989. Under Plaintiff's analysis, Plaintiff could have filed suit until some time in 1994.

■ It appears to the Court that Plaintiff was injured when he received some type of blood product containing the HIV virus prior to the time that companies began treating the blood products to kill the virus. Therefore, Plaintiff was injured some time prior to 1984. However, the injury itself did not trigger the statute of limitations.

■ The key issue, then, is at what point in time Plaintiff knew, or should have known, that he had been injured. In the Court's analysis, the knowledge available to the medical community must be imputed to Plaintiff since this knowledge would be similarly available to Plaintiff upon the exercise of due diligence.

Plaintiff has been most diligent in attempting to decipher the rapidly changing and often conflicting information that was available to him throughout the 1980's. He understood when he was diagnosed as being HIV positive that he had a virus for which there was no cure. The consequence of this virus was, as his doctor advised him, a "50–50 chance to live." Although the possibility of contracting AIDS was gener-

ally minimized in the information available to Plaintiff, Plaintiff was advised that he had a 50/50 chance of contracting AIDS which would result in death, not an insignificant injury.

■ Florida law does not require that Plaintiff know the full extent of his injury. Plaintiff need only have notice of the possible invasion of his legal rights. *University of Miami v. Bogorff*, 583 So.2d 1000 (Fla. 1991). By October 1985, Plaintiff knew that he was HIV positive and thus, that he had suffered an injury; *and* Plaintiff knew that he was HIV positive as a result of being treated with HIV-contaminated factor concentrate. The fact that Plaintiff did not test positive for AIDS until 1990 is not dispositive because under Florida law, the statute of limitations begins to run even if the full consequences of the injury are not known. *Byington v. A.H. Robins Co., Inc.*, 580 F.Supp. 1513 (S.D.Fla.1984); *City of Miami v. Brooks*, 70 So.2d 306 (Fla. 1954).

Recognizing that there was a potential problem with the statute of limitations, Plaintiff has attempted to craft an argument that Defendant fraudulently concealed Plaintiff's cause of action and, therefore, the statute of limitations must be tolled during the period of concealment. In the response to Defendant's motion, Plaintiff has argued that "Dr. Kitchens' failure to disclose his Cutter contacts to Plaintiff in 1988 when he advised Plaintiff not to sue Cutter, and his subsequent failure to disclose his expert relationship once it was formalized in 1989, raises questions of fraudulent conduct by both Cutter and Dr. Kitchens." Plaintiff's Response (Dkt. 177) at 14.

■ To prevail on a claim of fraudulent concealment in order to toll the statute of limitations, the Plaintiff must establish 1) that the Defendant successfully concealed the cause of action, and 2) that the Defendant employed fraudulent means to achieve that concealment. *Nardone v.*

---

**4.** The recall of factor concentrate in 1983 goes to Plaintiff's awareness of exposure to the product that allegedly caused his harm. In 1983, Plaintiff did not experience any symptoms or have any test results so as to be on notice that he had been injured.

*Reynolds,* 333 So.2d 25, 37 (Fla.1976). In *Nardone,* the Florida Supreme Court held that

> Although generally the fraud must be of such a nature as to constitute active concealment to prevent inquiry or elude investigation or to mislead a person who could claim a cause of action, we do recognize the fiduciary, confidential relationship of physician-patient imposing on the physician a duty to disclose; but, this is a duty to disclose known facts and not conjecture and speculation as to possibilities.

*Id.* at 39.

Solely for the purpose of deciding Plaintiff's fraudulent concealment argument, the Court accepts as fact that at the time Plaintiff had his conversation with Dr. Kitchens, Dr. Kitchens was working for Defendant. However, even if the Court were to go so far as to assume that Dr. Kitchens was a direct employee of Defendant, Plaintiff's argument must fail as a matter of law. Plaintiff already knew he was HIV positive and that he had been exposed to contaminated factor concentrate. Once he learned lawsuits were being filed by other hemophiliacs, he *knew* that he had a potential cause of action, *if* he chose to pursue it. He knew all of this before he spoke to Dr. Kitchens. Perhaps if Dr. Kitchens had told Plaintiff that he had not tested positive for the HIV virus or that exposure to contaminated factor concentrates could not result in a positive test result for the HIV virus, Plaintiff might have prevailed in a fraudulent concealment argument, even though Dr. Kitchens was not Plaintiff's personal physician. Perhaps if Plaintiff had been advised by an attorney that he had no basis for stating a claim of negligence or even a marginal chance of prevailing in court, the Court might be able to toll the running of the statute of limitations. However, Dr. Kitchens' opinion regarding the advisability of pursuing a lawsuit or of the alleged negligence of Defendant cannot toll the statute of limitations.

Plaintiff, in managing his hemophilia, has already overcome obstacles that most people will never encounter. It seems particularly tragic that he now has AIDS, through no fault of his own. Yet the Court cannot ignore the requirements of the statute of limitations as they have been set forth by the Florida legislature and interpreted by the Florida Supreme Court. Therefore, the Court finds that there exists no genuine issue of material fact concerning whether Plaintiff's cause of action accrued more than four years prior to the filing of the Complaint.

Accordingly, it is hereby ORDERED that Defendant Cutter's Second Motion for Summary Judgment on the Basis that Plaintiff's Amended Complaint is Time-Barred (Dkt. 154) is GRANTED. The Clerk is hereby directed to enter judgment in favor of Defendant.

DONE AND ORDERED.