768 A.2d 177 (2001)
338 N.J. Super. 1
Carol TROUM, Individually and as Executrix of the Estate of Arthur Troum, Plaintiff-Respondent,
v.
NEWARK BETH ISRAEL MEDICAL CENTER, John Doe Physicians 1-50, John Doe/ Jane Doe Medical Technicians 1-50, John Doe/Jane Doe Nurse/Other Medical Care Providers 1-50, John Doe/Jane Doe/ ABC Corporation 1-50, Manufacturers Distributors of Cryoprecipitate 1-50, Blood Banks 1-50, North Jersey Blood Center, a business enterprise of the State of New Jersey, American Association of Blood Banks, a national association member of blood banks with office in the State of Maryland, Isaac Gielchinsky, M.D., Kronish, Schkeeper and Lesser, a professional corporation of New Jersey, Eric Lentz, Esq., an attorney at law of New Jersey, Defendants, and
Luis Rivera, M.D., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 31, 2001.
Decided March 5, 2001.
*180 Jay Scott MacNeil, Roseland, argued the cause for appellant (Post, Polak, Goodsell & MacNeill, attorneys; Mr. MacNeil, of counsel; Franca D. Maiorano, on the brief).
James A. Mella, argued the cause for respondent (Mella & Dimiero, attorneys; Mr. Mella, Short Hills and Laura M. Le Winn, Trenton, on the brief).
Before Judges BAIME, CARCHMAN and LINTNER. *178
*179 The opinion of the court was delivered by BAIME, P.J.A.D.
Arthur Troum was infected with the human immunodeficiency virus (HIV) when a tainted blood product was administered during cardiothoracic surgery. The virus subsequently ripened into acquired immunodeficiency syndrome (AIDS) resulting in Troum's death. Plaintiff Carol Troum brought survival and wrongful death actions contending that Dr. Luis Rivera committed medical malpractice by unnecessarily ordering the tainted blood transfusion. This appeal followed a jury verdict in plaintiff's favor.
The principal question presented is whether the statute of limitations expired. Defendant argues that plaintiff's survival action accrued when the deceased tested positive for HIV and was aware that his infection was attributable to the fault of another. Plaintiff contends HIV and AIDS are separate diseases and that the injury was the onset of AIDS, not the discovery of the presence of the HIV infection.
Because the medical evidence establishes that HIV and AIDS occur as a seamless progression of a single pathology, we reject plaintiff's argument that each condition is a separate and distinct illness triggering a new statute of limitations. We hold that the survival action accrued when plaintiff tested positive for HIV and knew that his infection was caused by another's negligence. We also conclude that the deceased was subjectively aware of the correlation between HIV and AIDS, and that the survival action was not saved by the discovery rule. And finally, we are satisfied that the wrongful death claim did not require the availability of an action for damages by the deceased at the time of his death, and was thus not barred by expiration of the limitations period.

I. FACTS PERTAINING TO LIABILITY

Arthur Troum was a physician. Following a heart attack, Troum terminated his private practice and commenced employment with the Veteran's Administration.
In 1984, Dr. Isaac Gielchinsky performed a quadruple coronary artery bypass on Troum at Beth Israel Hospital. At trial, no one involved in the procedure had any independent recollection of the operation. Medical records indicated that the bypass was performed flawlessly. At the conclusion of the procedure, Troum was injected with protamine, a drug designed to promote clotting. Gielchinsky testified that this was a routine technique, and that none of the medical records indicated that Troum was bleeding excessively either during or after the operation.
Troum was transferred to the coronary care unit in stable condition. It was customary practice for the surgeon, the attending resident, the anesthesiologist, the profusionist[1], and a nurse to remain with the patient for approximately one-half hour. The doctors would then return to *181 the operating room, leaving the patient in the care of the resident in charge of the coronary care unit.
Dr. Rivera was the resident on call in the coronary care unit. He and two other residents had begun their cardiovascular surgery residencies only three weeks earlier. Barbara Corvino Diaz was the registered nurse. Because of time constraints, she would not record the name of the doctor giving specific orders at the time the orders were issued. At the conclusion of her shift, Corvino Diaz would identify the resident on call as the doctor who issued a particular order even though the order was actually issued by another physician.
The medical records indicated that Dr. Rivera ordered the administration of cryoprecipitate. It is undisputed that Troum was administered ten units of cryoprecipitate while in the coronary care unit shortly after completion of the bypass procedure. Cryoprecipitate is an extract of clotting factors from pooled blood. It is administered to promote clotting and stop excessive bleeding. Each unit of cryoprecipitate comes from a different donor. Thus, the risk of infection increases with the number of units of cryoprecipitate administered.
Although the parties devoted substantial effort in attempting to identify the physician who ordered the cryoprecipitate from the laboratory, that fact appears to be irrelevant. It is undisputed that the cryoprecipitate was ordered from the laboratory while the operation was ongoing. It is highly likely that Gielchinsky ordered the cryoprecipitate while performing the bypass as a precaution in the event it was needed later. Gielchinsky explained that it took between forty-five minutes and one and one-half hours for the laboratory to prepare the cryoprecipitate and deliver it to the patient. A surgeon would routinely order cryoprecipitate in order to assure its availability if the patient subsequently developed excessive bleeding.
The relevant questions were (1) whether the cryoprecipitate should have been administered to the patient, and (2) who actually ordered the blood transfusion. Plaintiff's expert, Dr. John Hutchinson, testified that administration of cryoprecipitate to Troum constituted a deviation from the accepted standard of care. At the time of the operation, the risk of HIV infection was just beginning to become known. However, it was common knowledge among physicians that the risk of administering cryoprecipitate included infecting the patient with hepatitis and other viruses and bacteria. Hutchinson explained that cryoprecipitate should be administered only to stem excessive bleeding and only after it is determined that the use of protamine has not had the desired effect of promoting clotting.
Based on the medical records, Hutchinson concluded that Troum's "drainage" during the first two hours after the surgery was moderate and was well within normal limits. Hutchinson did not alter his opinion when confronted with Corvino Diaz's notes, which indicated that there was "increased bleeding" from the patient's chest tube.
Defendant's expert, Dr. Joseph Cohen, disagreed with Hutchinson's conclusion that administration of cryoprecipitate was "contraindicated." Cohen explained that at the time of the operation there was no medical consensus as to the use of blood products for post-operative fluid replacement. Nor were there any governing standards. Cohen testified that the medical records suggested Troum suffered from abnormal bleeding. Evidence of this possibility included the fact that the cryoprecipitate was ordered while the bypass procedure was being conducted, and the fact that a fibrinogen test, which is used to measure the clotting factor in blood, was ordered immediately following the surgery.
Defendant denied ordering the administration of cryoprecipitate. He explained that the cardiovascular surgery residency program at Beth Israel Hospital was closely *182 supervised. The authority of the residents was narrowly circumscribed. Defendant testified that in his third week of training he would not have had the authority to order the administration of cryoprecipitate to a patient. Only the attending physician, the senior resident and the anesthesiologist would have such authority.
Defendant's testimony was corroborated by all the medical professionals associated with Troum's care. Gielchinsky testified that a resident with three weeks experience would not be permitted to order the administration of a blood product. Dr. Akrom Bhatti, the chief cardiovascular surgery resident at the time of Troum's surgery, found it "quite unlikely" that a junior resident could independently give a patient cryoprecipitate without consulting a supervising physician. Dr. Girya Surya, who commenced his cardiovascular surgery residency on the same day as defendant, testified that junior residents were instructed not to make any significant decision, such as giving transfusions, prescribing medications, or administering fluids, without consulting the chief resident or attending physician. Corvino Diaz explained that she did not accept orders from junior residents.
Troum remained in the hospital for nine days. He returned to work three months after his discharge. In April 1987, it was learned that Troum's blood transfusion was tainted with the HIV virus. Troum was so informed and tested positive for HIV the same month. We will describe Troum's emerging knowledge concerning the ramifications of his infection in our recital of the facts pertaining to the statute of limitations. It suffices to note here that after a period in which he remained largely asymptomatic, Troum's health rapidly deteriorated.
Troum began treatment with Dr. Jerome Levine, a specialist in infectious diseases. Initially, Troum appeared stable with no signs or symptoms of AIDS. At trial, Levine explained that HIV was the infection and that AIDS was the manifestation of the disease. Thus, Levine did not consider it unusual that Troum was initially free of symptoms associated with AIDS. The doctor also testified that while drugs could delay to some extent the onset of AIDS, the medical profession was cognizant of the fact that HIV-infected patients would eventually suffer from AIDS and die.
Levine explained that the virus attacks the part of the human immunological system called lymphocytes, or specifically the T-4 or CD-4 cells. The virus replicates itself, thus destroying the body's capacity to maintain a normal cell count, approximately 1000. As of September 1988, Troum's count was 782, which Levine characterized as being within the lower limits of the normal range. However, by October 1990, Troum's cell count fell to 136 what the medical community now considers "full-blown AIDS." Although Troum retired from his position with the Veterans Administration in July 1991, he continued to work on a part-time basis for approximately one year. By that time, Troum's weight had dropped to 116 pounds, and he began suffering bouts of disorientation.
Levine testified that Troum developed AIDS-related dementia in August 1992. This condition occurs when the virus attacks, and progressively destroys, the brain cells and neurologic tissues. Troum's dementia required repeated hospitalizations. Troum died on June 20, 1993. It is undisputed that Troum's wasting syndrome, immune system destruction, and dementia were all consequences of his HIV infection and were responsible for his death.

II. FACTS PERTAINING TO STATUTE OF LIMITATIONS

Pursuant to Lopez v. Swyer, 62 N.J. 267, 300 A.2d 563 (1973), the trial court conducted an evidentiary hearing to resolve factual questions relating to the statute of limitations. We recite the salient facts.
*183 On April 29, 1987, Troum received a letter stating that he may have received contaminated blood during his bypass surgery. Immediately thereafter, Troum was tested and was found to be infected with HIV. Plaintiff learned that her husband was HIV positive in September 1987.
That same month, plaintiff and Troum visited Troum's internist, Dr. Michael Markowitz. He advised the couple that Troum could remain asymptomatic for nine or ten years. Based upon their consultations with Dr. Markowitz and reading various articles, plaintiff and Troum knew that the HIV infection would ultimately progress to the AIDS virus. Plaintiff testified that she and her husband knew that the illnesses were "connected." They were aware of the fact that Troum would "eventually get" AIDS.
According to plaintiff, it was not until 1989 that she and her husband realized someone was at fault for ordering the administration of the tainted blood product. Before that time, the couple knew that Troum had been infected with HIV by reason of the blood product that had been given to him in the course of his bypass surgery, but assumed that this unfortunate event was merely the product of "bad luck." Because they felt like "victims," plaintiff and Troum consulted with an attorney who brought suit against Beth Israel Hospital and various fictitious defendants on March 30, 1990.
After being served with interrogatories, however, the couple directed their lawyer to dismiss the suit. They chose that course because Troum was depressed with the deterioration of his physical condition and did not want to spend his remaining days fighting a contentious lawsuit. Plaintiff and her husband were told that a suit alleging medical malpractice had to be instituted within two years of the date they learned of the departure from a recognized standard of care and its relationship with Troum's disease. They were also advised that the voluntary dismissal was without prejudice to their rights "with the exception of the statute of limitations defense." A stipulation of dismissal was filed on September 20, 1990, in which plaintiff and her husband declined to preserve the deposition of Dr. Troum, "either by way of transcript or videotape."
The couple reconsidered their decision in the winter of 1993. By that time, Troum's physical condition had substantially worsened. Troum was particularly concerned with how his death would affect his children and grandchildren. Plaintiff and her husband consulted with an attorney and discussed the possibility of filing suit after Troum's death. However, no further action was taken until September 8, 1994, some fifteen months after Troum's death. On that date, plaintiff filed the present action.[2]
Much of the evidence pertained to the relationship between HIV and AIDS. Plaintiff's infectious disease expert, Dr. Allan Pollock, testified that HIV and AIDS are not equivalent. He explained that an individual who becomes infected with HIV may be asymptomatic for a substantial period of time. The witness observed that in 1987, it could not be predicted with any degree of medical certainty that a person infected with HIV would ultimately develop AIDS. While there was an emerging body of knowledge correlating HIV with AIDS, there was no way to predict the *184 manifestation of the disease or its impact on the patient.
Pollock testified that the definition of AIDS has changed over the years. In 1987, the Center for Disease Control utilized a two-pronged test in defining AIDS: (1) the patient had to have one of the "indicators" or "marker" diseases associated with AIDS and (2) the patient must have tested positive for the HIV antibody. According to Pollock, a low CD-4 count, standing alone, was not considered a sufficient basis upon which to predicate a diagnosis of AIDS. In 1993, the Center modified its baseline definition of AIDS. The definition was expanded to include all patients whose CD-4 count fell below 200.
Applying the definition that was controlling between 1987 and 1990, Pollock concluded that Troum did not suffer from any of the enumerated "indicator" or "marker" diseases until the summer of 1992, when he developed dementia. However, if the 1993 definition were applied retrospectively, Troum would be considered to have begun suffering from AIDS in October 1990, when his CD-4 count first fell below 200.
Defendant's infectious disease expert, Dr. Alexander Kisch, disagreed with Pollock's application of the 1987 definition. He concluded that Troum's demonstrated wasting syndrome, swollen glands and decreased T-cell count served as "indicator" or "marker" conditions, which combined with the patient's positive test for HIV, made him eligible for a diagnosis of AIDS as early as 1990, which was the "beginning of that progression."
Kisch testified that HIV and AIDS are not separate diseases, but merely "two stages on the same spectrum." In expressing this view, Kisch acknowledged that the New Jersey Department of Health issued literature to physicians in 1987, advising them to tell their patients that most people infected with HIV were not expected to develop AIDS. Kisch insisted, however, that this information was not true. He believed that the Department's statements were designed to prevent patients from becoming suicidal or refusing treatment.
According to Kisch, a survey conducted in 1988 and published the same year disclosed that ninety percent of all HIV positive patients progressed to full-blown AIDS within a three year period. Kisch testified that he was aware of no scientific study deviating from the conclusion that almost all people infected with HIV ultimately develop AIDS and die. The witness added that more recent studies indicate that only two to three percent of HIV positive patients do not later develop AIDS.
Dr. Donald Louria, another infectious disease expert, substantially corroborated Kisch's conclusion that HIV and AIDS constitute different stages of a single pathology. Louria also agreed with Kisch's view that as of 1987 it was generally known that almost all patients infected with the HIV virus would develop AIDS and would die from that disease. Louria testified that Troum suffered from AIDS beginning in October 1990, when the deceased's CD-4 count fell below 200. While acknowledging that the Center's 1987 definition of AIDS would not be satisfied by a low CD-4 count, Louria emphasized that medical experts working with HIV patients in the 1980's knew that a CD-4 count below 200 signified that the infection had progressed to full-blown AIDS. According to the witness, the Center's 1993 definition merely memorialized what everyone dealing with AIDS already knew.
Dr. Kenneth Weiss, a psychiatrist, testified that Troum's ability to pursue a legal remedy was affected by the depression and anxiety that began when the deceased learned he was HIV positive. Weiss noted that Troum was treated by a psychiatrist for approximately six months in 1987. By 1992, Troum had developed a severe psychiatric disturbance, which included hallucinations, disorientation and paranoia. Weiss concluded that from some point in *185 1990 until his death, Troum was severely "incapacitated" and "insane."

III. THE JUDGE'S DECISION ON THE STATUTE OF LIMITATIONS

The Law Division judge concluded that the statute of limitations with respect to the survival action did not begin to run until Troum was diagnosed with AIDS. Citing toxic tort decisions, the judge determined that the statute does not commence in a case involving a latent disease until there is a clinical manifestation of the illness or a reasonable medical probability that the plaintiff will become symptomatic. The judge stressed that "between May 1987 and August 1992, Troum was merely HIV positive [and] had not developed the disease of AIDS." The judge noted that "[i]t was not until August or September 1992 that [Troum] developed his first clinical symptoms of AIDS which was the AIDS-related dementia/encephalopathy." Applying the 1987 definition of AIDS promulgated by the Center for Disease Control, the judge reasoned that Troum knew he had AIDS in the autumn of 1992. By that time, Troum suffered from a "marker" or "indicator" illness and tested positive for HIV.
The judge further concluded that Troum had no reason to institute suit when he first became aware he tested positive for HIV. The judge emphasized that Troum was entirely asymptomatic at that time, and that "the development of AIDS from HIV infection was by no means certain" in 1987. The judge cited the New Jersey Department of Health letter to physicians, which stated that "most people affected with the HIV virus are not expected to develop AIDS, and many may remain totally asymptomatic." The judge reasoned that "if the medical community could not have predicted with medical probability that Troum would develop AIDS, it [would be] unreasonable and unfair to expect or require Troum to have such knowledge."
It is against this factual backdrop that we address the issues raised.

IV. REJECTION OF THE SEPARATE DISEASE THEORY

Medical malpractice actions must be commenced within two years of the alleged negligence. N.J.S.A. 2A:14-2. However, the discovery doctrine "postpone[s] the accrual of a cause of action" so long as a party reasonably is unaware either that he has been injured, or that the injury is due to the fault or neglect of an identifiable individual or entity. Vispisiano v. Ashland Chem. Co. ., 107 N.J. 416, 426-27, 527 A.2d 66 (1987). "`Critical to the running of the statute is the injured party's awareness of the injury and the fault of another.'" Martinez v. Cooper Hospital, 163 N.J. 45, 52, 747 A.2d 266 (2000) (quoting Baird v. American Med. Optics, 155 N.J. 54, 66, 713 A.2d 1019 (1998)). The question is whether the facts presented would alert a reasonable person exercising ordinary diligence that he was injured due to someone else's fault. Ibid. The standard is basically an objective onewhether the plaintiff "knew or should have known" of sufficient facts to start the statute of limitations running. Ibid. "That does not mean that a plaintiff must have knowledge of a specific basis for legal liability or a provable cause of action before the statute of limitations begins to run." Ibid. (citing Savage v. Old Bridge-Sayreville Med. Group, 134 N.J. 241, 248, 633 A.2d 514 (1993)). It does, however, require knowledge not only of the injury but also that another is at fault. Ibid.; see also Lynch v. Rubacky, 85 N.J. 65, 70, 424 A.2d 1169 (1981). Both are critical elements in determining whether the discovery rule applies. Martinez v. Cooper Hospital, 163 N.J. at 52, 747 A.2d 266; see also Mancuso v. Neckles ex rel. Neckles, 163 N.J. 26, 29, 747 A.2d 255 (2000); Gallagher v. Burdette Tomlin Mem. Hosp., 163 N.J. 38, 43, 747 A.2d 262 (2000).
For that analysis, plaintiffs are divided into two classes: those who do not *186 know that they have been injured and those who know they have suffered an injury but do not know that it is attributable to the fault of another. Lopez v. Swyer, 62 N.J. at 274, 300 A.2d 563. Here, it is undisputed that by 1989 the Troums were aware that an identifiable entity or person was responsible for the administration of the tainted cryoprecipitate. It was at this time that they consulted a lawyer for the purpose of bringing suit. In a similar vein, the Troums knew in 1987 that Dr. Troum had suffered an injury. By September 1987 both Troum and plaintiff were aware that Troum tested positive for HIV.
The question then is what a plaintiff must "discover" before he will be deemed to have a cause of action for wrongful transmission of the AIDS virus. Stated somewhat differently, at issue is whether the statute of limitations "clock begin[s] to run when the plaintiff is infected with HIV or when the plaintiff actually develops AIDS." Catherine Colyer, "Wrongful Infection with the HIV Virus: When Should the Clock Start Ticking on the Statute of Limitations?," 4 Va. J. Soc. Pol'y & L. 235, 236 (1996) (Coyler, "Wrongful Infection").
We have found no reported New Jersey decision dealing with this precise issue. In a somewhat related context, however, our Supreme Court has held in Mauro v. Raymark Industries, Inc., 116 N.J. 126, 561 A.2d 257 (1989), that in order to recover damages for the enhanced risk of contracting a future disease caused by exposure to a dangerous substance, the plaintiff must prove that the prospective illness is at least reasonably probable to occur. The Court observed that "limiting recognition of enhanced-risk claims to those that prove to a reasonable medical probability the likelihood of future injury" is supported by important public policy considerations. Id. at 142-43, 561 A.2d 257. Specifically, "[t]hose claims that fail to meet this standard, if presented to juries, would require damage awards for diseases that are prospective, speculative, and less than likely to occur." Id. at 143, 561 A.2d 257. Moreover, "[t]he more speculative the proof of future disease, the more difficult would be the juries' burden of calculating fair compensation." Ibid. Inevitably, damage awards would be rendered for diseases that never actually occur, "exacting a societal cost in the form of higher insurance premiums and higher product costs." Ibid. The Court noted that where the plaintiff is unable to demonstrate a reasonable probability he will suffer a future disease, there remains available the later opportunity to assert such a claim if and when the illness occurs. Ibid. In that respect, the Court observed that "removal of the statute of limitations ... doctrine[ ] as a bar to the institution of suit when the disease for which plaintiff is at risk ultimately occurs [will] enhance[ ] the quality of the remedy that tort law can provide in such cases." Ibid.
The Court relied heavily on its earlier decision in Ayers v. Jackson Tp., 106 N.J. 557, 525 A.2d 287 (1987). That case involved a nuisance action against a municipality arising out of the contamination of its water supply by toxic pollutants. The Court held that the plaintiffs could not recover damages for the enhanced risk of contracting cancer absent quantification of the increased risk. Id. at 598-99, 525 A.2d 287. The Court stated that the enhanced risk claim was not cognizable absent testimony that there was a "reasonable probability" the plaintiffs would contract the disease in the future. Id. at 598-99, 525 A.2d 287. The Court stressed that a timely filed cause of action prompted by future discovery of the disease would not be barred by the statute of limitations. Id. at 583, 525 A.2d 287.
We had occasion to apply these principles in Karol v. Berkow, 254 N.J.Super. 359, 603 A.2d 547 (App.Div.1992). There, the plaintiff consulted a doctor in 1983 regarding a cyst. One year later, a biopsy disclosed a malignancy. Two years after that disclosure, the plaintiff brought suit for failure to properly diagnose the cyst, *187 claiming that the delay increased the risk of his dying within the next seven years from three percent to twenty-three percent. The plaintiff subsequently dismissed that suit without prejudice. Three years later, he was given a diagnosis of metastatic malignant melanoma. Within two years of that diagnosis, plaintiff brought a new suit, claiming that his risk of death had increased to seventy percent. We concluded that the plaintiff's increased-risk-of-harm cause of action did not accrue until he was diagnosed with metastatic cancer. Id. at 362, 603 A.2d 547. In reaching that conclusion, we reasoned that when the plaintiff initially filed suit, the increased risk of his dying, from three percent to twenty-three percent, "would not support a finding that the apprehended consequence, i.e., recurrence of the melanoma was `reasonably probable'...." Id. at 368, 603 A.2d 547. Cf. Devlin v. Johns-Manville Corp., 202 N.J.Super. 556, 495 A.2d 495 (Law Div.1985) (where claim against manufacturers and distributers of asbestos-related products for increased risk of cancer, as part of an asbestosis claim, was rejected for failure to show reasonable medical probability of future cancer, the entire controversy doctrine would not bar any subsequent action if the claimant actually contracted the disease).
The cases we have cited define when a plaintiff may bring a lawsuit for the enhanced risk of contracting a future disease. As phrased by plaintiff, however, the question presented here is when a plaintiff must bring an action for a future illness or suffer the consequences of a dismissal based upon the statute of limitations. The issues are closely connected, but are not necessarily the same. We need not decide whether a person must bring suit whenever he is aware of a reasonable probability that he will contract a disease in the future because of another's negligence or fault.[3] That is not the question with which we are presented because it is undisputed that Dr. Troum had the disease already. This case does not involve a question of increased risk. Rather, the issue is whether HIV and AIDS are distinct illnesses or simply different stages of the same pathology.
We do not view the HIV infection and the AIDS virus as distinct illnesses, each representing a separate cause of action and triggering a new statute of limitations. The available evidence abounds the other way. HIV causes AIDS. They are different stages of a single pathology. According to Dr. Kisch, ninety percent of all HIV positive patients progress to full-blown AIDS within three years. More recent studies show that "[a]n average of ten years lapses between the time an individual is infected with the HIV virus and the time that individual is diagnosed as having AIDS." Coyler, "Wrongful Infection," 4 Va. J. Soc. Pol'y & L. at 248. "During that ten year period, most individuals do not remain asymptomatic." Id. at 248-49. Instead, once a person is infected with HIV, he may contract multiple diseases before the T-cell count ever drops below 200 or "before [the person] contracts one of the twenty-six specific diseases that will result in a diagnosis of AIDS." Id. at 249.
Faced with this reality, other jurisdictions have held that the statute of limitations for the wrongful transmission of AIDS begins to run when the plaintiff knows that he has been infected with the HIV virus and is aware, or should reasonably be aware, that his injury is attributable to the fault or neglect of another. See, e.g., Nelson v. American Nat. Red Cross, 26 F.3d 193, 197 (D.C.Cir.1994); Smith v. American Red Cross, 876 *188 F.Supp. 64, 67 (E.D.Pa.1994); Doe v. Cutter Biological, 813 F.Supp. 1547, 1555 (M.D.Fla.1993), aff'd, 16 F.3d 1231 (11th Cir.1994); Berrios v. Miles, Inc., 226 Mich.App. 470, 476, 574 N.W.2d 677, 680 (1997); DiMarco v. Hudson Valley Blood Services, 147 A.D.2d 156, 162, 542 N.Y.S.2d 521, 524-25 (1989); Doe v. University Hosp., 148 Misc.2d 756, 758, 561 N.Y.S. 2d 326, 328 (N.Y.Sup.Ct.1990); Murray v. Hamot Med. Ctr. of Erie, 429 Pa.Super. 625, 633 A.2d 196, 202 (1993), appeal denied, 540 Pa. 632, 658 A.2d 796 (1994).
In Nelson v. American Nat. Red Cross, 26 F.3d 193 (D.C.Cir.1994) the plaintiff received a blood transfusion during abdominal surgery in order to terminate excessive bleeding. Approximately one year later, the plaintiff was informed that the blood had been drawn from an individual who later tested positive for the HIV virus. The plaintiff was immediately tested, resulting in a positive finding of HIV infection. Some eighteen months later, the plaintiff became symptomatic. Two years later, the plaintiff developed AIDS. Suit was commenced two years after the onset of AIDS. The plaintiff's survival action was dismissed based upon the statute of limitations. On appeal, the plaintiff argued that the survival action did not accrue when the plaintiff learned that he was HIV positive, but rather when he was informed that he was suffering from AIDS. The District of Columbia Circuit Court rejected that contention, holding that "a plaintiff is injured when he becomes HIV positive and that the statute of limitations begins to run as soon as the plaintiff discovers his injury through an HIV positive result." Id. at 196-97.
A similar result was reached in Smith v. American Red Cross, 876 F.Supp. 64 (E.D.Pa.1994). The deceased was transfused with a tainted blood product in the course of coronary bypass surgery which took place in 1984. Three years later, she tested positive for HIV and was told that she had been given tainted blood during the earlier surgery. Although the deceased was asymptomatic for several years, she ultimately developed AIDS and died. A survival action was commenced in 1993. The defendants moved to dismiss, maintaining that the cause of action accrued in 1987, when the deceased, learned that she was HIV positive and that the cause of her illness was the 1984 blood transfusion. The plaintiff argued that HIV and AIDS were "separate and distinct illnesses," with each supporting a separate and distinct limitations period. Id. at 67. The district court was unpersuaded by the plaintiff's contention and dismissed the survival action. Id. at 69-70. The court reasoned that unlike asbestos exposure, which can result in a number of separate and distinct diseases, HIV and AIDS represent different stages of the same illness. Id. at 69. In reaching this conclusion, the court noted that, although "HIV infection progresses very slowly in a small percentage of individuals who may never develop AIDS ..., it is not sheer speculation ... that HIV infection will ultimately result in full-blown AIDS as a definite and clearly defined medical connection exists between the two conditions." Ibid.
In Doe v. Cutter Biological, 813 F.Supp. 1547 (M.D.Fla.1993), the plaintiff, a hemophiliac, was transfused with a tainted blood product. The plaintiff tested positive for HIV in 1985, and his physician informed him that the infection probably was caused by the earlier transfusion. Although armed with this knowledge, the plaintiff did not institute suit until he was later diagnosed with AIDS. He argued that for the purpose of the statute of limitations, the injury was the onset of AIDS, not the discovery of the presence of HIV infection. The district court dismissed the plaintiff's suit, holding that the limitations period began to run when the plaintiff discovered his injury through an HIV positive test result. Id. at 1555.
These decisions are highly persuasive. A requirement that a person must bring suit within two years of learning that he is HIV positive because of a *189 tainted blood transfusion is supported by substantial public policy concerns and comports with the objectives underlying the statute of limitations. A statute of limitations has several salutary purposes. "The most important of these purposes recognizes that eventual repose creates desirable security and stability in human affairs." Galligan v. Westfield Centre Service, Inc., 82 N.J. 188, 191-92, 412 A.2d 122 (1980); see also Tevis v. Tevis, 79 N.J. 422, 430, 400 A.2d 1189 (1979); Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 115, 299 A.2d 394 (1973); State v. U.S. Steel Corp., 22 N.J. 341, 358, 126 A.2d 168 (1956). Time restrictions "`penalize dilatoriness.'" Ochs v. Federal Ins. Co., 90 N.J. 108, 112, 447 A.2d 163 (1982) (quoting Farrell v. Votator Div. of Chemetron Corp., 62 N.J. at 115, 299 A.2d 394). By penalizing unreasonable delay, "such statutes induce litigants to pursue their claims diligently so that answering parties will have a fair opportunity to defend." Galligan v. Westfield Centre Service, Inc., 82 N.J. at 192, 412 A.2d 122; see also Housing Auth. of Union City v. Commonwealth Trust Co., 25 N.J. 330, 335, 136 A.2d 401 (1957). So too, statutes of limitations "spare the courts from litigation of stale claims." State v. Standard Oil Co., 5 N.J. 281, 295, 74 A.2d 565 (1950) (quoting Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628, 1635 (1945)), aff'd sub nom. Standard Oil Co. v. New Jersey, 341 U.S. 428, 71 S.Ct. 822, 95 L.Ed. 1078 (1951). "Once memories fade, witnesses become unavailable, and evidence is lost, courts no longer possess the capacity to distinguish valid claims from those which are frivolous and vexatious." Galligan v. Westfield Centre Service, Inc., 82 N.J. at 192, 412 A.2d 122.
We are convinced that adoption of plaintiff's argument would corrupt the purpose of the statute of limitations. Potential defendants of such suits would be denied the benefit of repose, since the progression of HIV to AIDS could take many years. In order to promote finality, we cleave to the general principle that the discovery of an injury, not its attainment of some threshold status, commences the running of the statute of limitations. Although a person infected with HIV may be asymptomatic at an early stage of his illness, he nevertheless has a substantial incentive to seek judicial relief. In today's climate, such a person undoubtedly knows that the virus continues to affect the host's immune system until it becomes so depressed that a limitless number of infirmities may occur. Indeed, treatment at this stage through newly developed drugs poses its own set of risks. Unfortunately, the ultimate outcome for most people inflicted with the HIV virus is full-blown AIDS and death. The downward course of the disease varies from person to person but is nevertheless sufficiently predictable to permit compensation in terms of a jury award. Monetary damages are not overly speculative. We perceive little danger of unfairly excessive or inadequate damages. We thus conclude that a plaintiff must ordinarily institute suit within two years of learning that he is HIV positive as a result of another's fault, or forego his claim because of expiration of the statute of limitations.

V. THE TROUMS' SUBJECTIVE KNOWLEDGE

Plaintiff contends that the correlation between HIV and AIDS was not a matter of public knowledge in 1987 when the Troums learned that the deceased was HIV positive. She thus asserts that neither she nor the deceased could have known with certainty that Dr. Troum would ultimately develop AIDS. As we noted earlier, the Law Division judge agreed with this argument. He concluded that plaintiff had no duty to institute suit for wrongful transmission of the AIDS virus because in 1987 there was no medical consensus that HIV ultimately progressed to AIDS.
Although the question is novel in New Jersey, other jurisdictions have differed *190 respecting when the medical and scientific communities reached a consensus that HIV and AIDS were different stages of a single pathology. Compare Spence v. Miles Laboratories, Inc., 37 F.3d 1185, 1187 (6th Cir.1994) (1984 marks the time when the relationship between HIV and AIDS became known); McKee v. Cutter Laboratories, 866 F.2d 219, 224 (6th Cir. 1989) (same); Berrios v. Miles, Inc., 226 Mich.App. at 476-77, 574 N.W.2d at 680 (same), with New v. Armour Pharmaceutical Co., 67 F.3d 716, 721 (9th Cir.1995) (none of the cases in 1989 showed that the symptoms of HIV inevitably presaged AIDS). We need not resolve the issue here. Plaintiff testified unequivocally that both she and the deceased knew that the HIV infection would ultimately ripen into full-blown AIDS. According to her testimony, the couple knew that HIV and AIDS were "connected." They were fully aware of the fact that Dr. Troum would "eventually get" AIDS. Based upon that knowledge, the Troums brought suit on March 30, 1990. The complaint specifically alluded to the possibility that Dr. Troum would ultimately become symptomatic and suffer the affliction of AIDS. Damages were sought on this basis. Moreover, it is evident from the Troums' Stipulation of Dismissal that the couple anticipated Dr. Troum's death. In that consent order, the Troums declined to preserve Dr. Troum's testimony, either by way of transcript or videotape.
While we are sympathetic to plaintiff and similarly situated individuals, we cannot agree with the Law Division judge's analysis. The Troums' subjective knowledge of the relationship between HIV and AIDS was such as to preclude plaintiff from obtaining the benefit of the discovery rule.

VI. REMAINING ARGUMENTS PERTAINING TO STATUTE OF LIMITATIONS

We turn to plaintiff's remaining arguments concerning the statute of limitations. These contentions are: (1) plaintiff substantially complied with the statute of limitations by instituting suit on March 30, 1990, (2) the survival action accrued in 1995, as mandated by N.J.S.A. 2A:14-26.1(b), and (3) Troum's mental incapacitation tolled the statute of limitations. We also consider defendant's argument that the wrongful death claim should be dismissed because it is derivative of the survival action which is barred by the statute of limitations. Although these arguments were advanced in the Law Division, the judge had no occasion to address them.
We find no merit in plaintiff's claim of substantial compliance. Plaintiff's argument rests on two Supreme Court decisions. In Negron v. Llarena, 156 N.J. 296, 716 A.2d 1158 (1998), the plaintiff, asserting federal diversity jurisdiction, brought suit against the defendants in the district court within the limitations period. The federal action was dismissed because of the lack of subject matter jurisdiction. The plaintiff immediately filed her complaint in the Law Division, but by that time the statute of limitations had expired. The trial court denied the defendants' motion to dismiss, but we reversed, holding that the earlier filing in the federal court did not toll the limitations period. The Supreme Court reversed our judgment and reinstated the plaintiff's complaint. Id. at 307, 716 A.2d 1158. In holding that the plaintiff had substantially complied with the statute, the Court noted: (1) the earlier filing placed the defendants on notice of the wrongful death claim, (2) the federal complaint was filed within the appropriate time frame, and the Law Division action was commenced immediately following its dismissal, (3) the plaintiff's diligent filing of the complaints complied with the purpose of the statute of limitations, and (4) the defendants were not prejudiced because the discovery process in the federal action afforded them the opportunity to investigate the underlying facts. Id. at 305, 716 A.2d 1158.
*191 The Court was confronted with essentially the same facts in Galligan v. Westfield Centre Service, Inc., 82 N.J. 188, 412 A.2d 122 (1980). The plaintiff's attorney incorrectly filed a wrongful death and survival claim in the federal court. While that action was pending and before the district court ruled on the defendants' motion to dismiss, the plaintiff filed a complaint in the Law Division. The Law Division dismissed the survival claim on the basis of the statute of limitations, and we denied leave to appeal. The Supreme Court reversed, holding that "[u]nswerving, `mechanistic' application of [the] statute[ ] of limitations would ... inflict obvious and unnecessary harm ... without advancing [any] legislative purpose[ ]." Id. at 192, 412 A.2d 122. In reaching this conclusion, the Court stressed that "[t]imely notice of plaintiff's survival claimsalbeit by the unconventional vehicle of a jurisdictionally deficient complaintha[d] alerted defendants to the possibility of having to defend against the allegations." Id. at 193-94, 412 A.2d 122.
Plaintiff's reliance on these decisions is misplaced. Plaintiff's earlier lawsuit alerted Beth Israel Hospital of her claims only in the most ephemeral sense. The complaint was voluntarily dismissed at plaintiff's behest, before discovery proceedings were completed. The survival claim was renewed only after the lapse of a substantial period of time. We deem Negron and Galligan inapposite. Plaintiff did not substantially comply with the requisites of the statute of limitations.
We are also unpersuaded by plaintiff's claim that the survival action accrued in 1995 by reason of legislative intervention. Plaintiff relies on N.J.S.A. 2A:14-26.1(b), which provides:
Notwithstanding the provisions of any other law to the contrary, no action for damages based upon personal injury, survivorship or wrongful death brought against a proprietary manufacturer of blood products based on infusion of a blood product resulting in contracting human immunodeficiency virus (HIV) or acquired immunodeficiency syndrome (AIDS) shall be deemed to accrue prior to July 13, 1995.
By its express terms, the statute applies only to suits filed against proprietary manufacturers of blood products. Although the original bill would have reopened all claims against all potential defendants, the proposed legislation was later amended to delete hospitals, doctors and others. See D.J.L. v. Armour Pharmaceutical Co., 307 N.J.Super. 61, 91, 704 A.2d 104 (Law Div. 1997). The statute has no applicability here.
Equally unpersuasive is plaintiff's argument that the statute of limitations was tolled by Dr. Troum's mental incapacity. Nothing in the record suggests that Troum was mentally incapacitated until he developed the symptoms of dementia. This occurred in 1992, long after the limitations period had expired.
We hold that plaintiff's survival action was barred by the statute of limitations. Plaintiff's wrongful death claim is unaffected by this conclusion. See Miller v. Estate of Sperling, 166 N.J. 370, 766 A.2d 738 (2001).

VII. DEFENDANT'S OTHER CONTENTIONS

We find no merit in defendant's other arguments. R. 2:11-3(e)(2). Specifically, we reject defendant's argument that (1) Dr. Hutchinson's opinion testimony should have been excluded, and (2) the jury's verdict is against the weight of the evidence.
Dr. Hutchinson's conclusions were based on the facts supplied to him by others and his own training and experience. His testimony was properly admitted. See Taylor v. DeLosso, 319 N.J.Super. 174, 181, 725 A.2d 51 (App.Div.1999); Crespo v. McCartin, 244 N.J.Super. 413, 422, 582 A.2d 1011 (App.Div.1990); Bellardini v. Krikorian, 222 N.J.Super. 457, 463, 537 A.2d 700 (App.Div.1988).
*192 As to the efficacy of the jury's verdict, we agree with defendant's contention that the evidence against him can fairly be characterized as weak. However, it does not clearly and convincingly appear that there was a miscarriage of justice under the law. Dolson v. Anastasia, 55 N.J. 2, 6-7, 258 A.2d 706 (1969). While the evidence established that a junior resident did not have the authority to order the administration of a blood product, the jury could reasonably have found that defendant took it upon himself to issue such an order.
The judgment is affirmed in part and reversed in part. The matter is remanded to the Law Division for modification of the judgment.
NOTES
[1] The profusionist operated the heart/lung machine during the surgery.
[2] We add the following facts for the sake of completeness. As we noted, plaintiff's survival and wrongful death action was filed on September 8, 1994. Named defendants were Beth Israel Hospital, Dr. Gielchinsky, and various fictitious defendants. The complaint was amended in June 1995 to add the North Jersey Blood Center and the American Association of Blood Banks as defendants. The complaint was again amended in November 1995 to add Dr. Rivera as a defendant. The complaint was amended a third time in June 1996 to include a legal malpractice claim against Kronisch, Schkeeper and Lesser, and Eric Lentz. Plaintiff voluntarily dismissed her claims against Beth Israel Hospital, Gielchinsky, and the attorneys. Her claim against the blood bank defendants was settled. By the time of the trial, only Dr. Rivera remained as a defendant.
[3] In Karol v. Berkow, we briefly addressed this issue. However, we found it unnecessary to resolve the question. Specifically, we noted that the facts of the case did not require a determination of "whether or under what circumstances an increased-risk-of-harm cause of action brought after the actual occurrence of harm may be held time-barred upon a showing that plaintiff knew or ought to have known more than two years earlier that the likelihood of future harm was reasonably probable." Karol v. Berkow, 254 N.J.Super. at 368, n. 2, 603 A.2d 547.